Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LEWIS BRISBOIS BISGAARD &  §
SMITH, LLP,                 §
                           §
     Plaintiff,            §
                           §
v.                         §
                           § Case No. 4:22-cv-3279
                           §
MICHAEL JOSEPH BITGOOD,    §
a/k/a "Michael Easton,"    §
et al.,                    §
                           §
     Defendants.           §


************************************************************
ORAL DEPOSITION OF
MEREDITH R. RIEDE
APRIL 1, 2024
************************************************************


     ORAL DEPOSITION OF MEREDITH R. RIEDE, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered cause
on the 1st day of April, 2024, from 11:30 a.m. to
12:26 p.m., before John G. Rochelle, CSR in and for the
State of Texas, reported by machine shorthand, at 515
Rusk Street, Courtroom 3A, Houston, Texas, pursuant to
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.


**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF, LEWIS BRISBOIS BISGAARD & SMITH LLP:

 4        Mr. Bennett G. Fisher
          bennett.fisher@lewisbrisbois.com

 5        Mr. William S. Helfand
          bill.helfand@lewisbrisbois.com

 6        Lewis Brisbois Bisgaard & Smith LLP
          24 Greenway Plaza, Suite 1400

 7        Houston, Texas 77046
          Phone: (713) 659-6767

 8

 9

10   FOR THE DEFENDANT, BRADLEY BEERS:

11        Mr. S. Wallace Dunwoody IV
          wdunwoody@munckwilson.com

12        Munck Wilson Mandala
          600 Banner Place Tower

13        12770 Coit Road
          Dallas, Texas 75251

14        Phone: (972) 628-3616

15

16

     FOR THE DEFENDANT, MICHAEL JOSEPH BITGOOD, A/K/A
17   "MICHAEL EASTON," ET AL:

18        Mr. Michael Joseph Bitgood (pro se)
          eastprolaw@msn.com

19        EastProLaw
          503 FM 359, Suite 130

20        Richmond, Texas 77406
          Phone: (281) 415-8655

21

22

23

24

25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1    FOR THE DEFENDANT, RICHARD P. JONES:
 2         Ms. Susan C. Norman
           suenorman@suenormanlaw.com
 3         Law Office of Susan C. Norman
           P.O. Box 55585
 4         Houston, Texas 77255
           Phone: (713) 882-2066
 5
 6
 7    FOR THE WITNESS, MEREDITH R. RIEDE:
 8         Mr. Ramon G. Viada III
           rayviada@viadastrayer.com
 9         Viada & Strayer
           17 Swallow Tail Court, Suite 100
10         The Woodlands, Texas 77381
           Phone: (281) 419-6338
11
12
13    PRESIDING JUDGE:
14         Mr. Keith P. Ellison
15
16
      ALSO PRESENT:
17
           Mr. Deshun Bradley
18         Ms. Rhonda Clark
           Mr. David A. Oubre
19
20
21
22
23
24
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1                         INDEX
 2                                                    PAGE
 3
 4   Appearances........................................   2
 5   MEREDITH R. RIEDE
 6        Examination by Mr. Bitgood...................   6
 7        Examination by Ms. Norman....................  34
 8        Examination by Mr. Dunwoody..................  35
 9        Examination by Mr. Bitgood...................  41
10   Signature and Changes........................... 43-44
11   Reporter's Certificate...........................  45
12
13
14

                           EXHIBITS
15
     NO.  DESCRIPTION                                  PAGE
16
     Exhibits 1 through 7
17        (Not admitted)
18
     Exhibit 8........................................   8
19        Email from EastProLaw dated August 17, 2022,
          subject "Brice Beale/Bryce Spencer," including
20        attachment entitled "Time Line and Chronology"
21
     Exhibit 8 A......................................   8
22        August 17, 2022 document entitled "Time Line
          and Chronology"
23
24   Exhibits 9 through 32
          (Not admitted)
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

 1    Exhibit 32 A....................................  13
            Documents 60-1, 61-3, 61-4 in Case 4:22-cv-03279
 2
 3    Exhibits 33 through 35
            (Not admitted)
 4
 5    Exhibit 35 A....................................  22
            NRES Management, LLC W-2 for 2022
 6
 7    Exhibits 36 and 37
            (Not admitted)
 8
 9    Exhibit 38 C....................................  24
            Letter from Meredith R. Riede to Ken Paxton
10          dated February 6, 2023
11
      Exhibits 39 through 43
12          (Not admitted)
13
      Exhibit 44.....................................   7
14          Plaintiff's Initial Disclosures
15
16
17
18
19
20
21
22
23
24
25

Page 6

```
 1                        MEREDITH R. RIEDE,
 2   having been first duly sworn, testified as follows:
 3                        EXAMINATION
 4   BY MR. BITGOOD:
 5        Q.  Good morning, ma'am.  Would you state your name
 6   for the record, please?
 7        A.  Meredith Riede.
 8        Q.  Ms. Riede, can we stipulate that you're an
 9   attorney at law, you've got an undergraduate degree --
10             THE COURT:  This is a problem.  I'm not
11   hearing you.
12             MR. BITGOOD:  Okay.
13             THE COURT:  Get near a mike, if you would.
14             MR. BITGOOD:  Can you hear me now, Your
15   Honor?
16             THE COURT:  I can hear you now.
17             MR. BITGOOD:  Okay.
18        Q.  (BY MR. BITGOOD)  Ms. Riede, what do you do for
19   a living?
20        A.  I'm a city attorney for the City of Sugar Land.
21        Q.  You're an attorney at law?
22        A.  Yes, I am.
23        Q.  Licensed by the Supreme Court of Texas?
24        A.  Yes, I am.
25        Q.  Are you licensed to practice in the Southern
```

1   District as well?

2       A.  No.

3           THE COURT:  Okay.  A little bit -- pull

4   your mike a little bit closer to you.

5       A.  No.

6           THE COURT:  You're okay.  I can hear you.

7   I can't hear Mr. Bitgood.

8       Q.  (BY MR. BITGOOD)  Okay.  Ms. Riede, I'm handing

9   you what's been marked now as Defendants Exhibit No. 44.

10  And it's a document entitled "Plaintiff's Initial

11  Disclosure."  I'd like to bring to your attention page 4

12  of this exhibit, the small letter f.  Could you read

13  into the record what the small letter f says?

14      A.  "Meredith Riede, The City of Sugar Land, 2700

15  Town Center Boulevard North, Sugar Land, Texas 77479.

16  Ms. Riede is likely to have discoverable information

17  regarding Defendants' use of Plaintiff's protected marks

18  and names."

19      Q.  Okay.  Having seen that disclosure, I want to

20  talk to you a little bit about that disclosure that they

21  put out there.  It says you have knowledge that

22  defendants have used the names and marks of Lewis

23  Brisbois Bisgaard & Smith.  When did you first become

24  aware that such an infringement was going on?

25      A.  When you sent to me an email on August 17th,

1  2022, at 4:27 entitled "Brice Beale/Bryce Spencer."  I
2  believe it's Exhibit 25.
3      **Q.  This is the email that was given to the Court**
4  **on October 6, 2022.  And all it has is a question mark.**
5  **Would this be the email that I sent you?  See the**
6  **question mark at the top?**
7      A.  This appears to be Exhibit 25, an email I sent,
8  yes.
9      **Q.  Okay.**
10     A.  On August 17th.
11     **Q.  Was there an attachment to that email?**
12     A.  Yes.
13     **Q.  Okay.  I'm going to hand you what's been marked**
14 **as Defendants Exhibit 8 and 8 A.  Do you recognize that**
15 **exhibit, and do you recognize the attachment, 8 and 8 A,**
16 **as in Adam?**
17          MR. FISHER:  Mr. Easton, do you have a copy
18 of that for me to look at?
19          MR. BITGOOD:  She's got one.  You can let
20 him look at that.
21     A.  It appears to be the same as Exhibit 25 that I
22 was --
23     **Q.  (BY MR. BITGOOD)  Do you want to exam it page**
24 **by page to make sure --**
25     A.  If it's not the same as Exhibit 25, then, yes,

```
 1    I would.
 2         Q.  It is the same thing, but --
 3         A.  If you're saying it's the same --
 4         Q.  It is.
 5         A.  -- then I'm fine.  Okay.  If it's the same,
 6    let's go.
 7         Q.  Thank you, ma'am.  Make sure these go to him.
 8              MR. BITGOOD:  Can I turn these over to him
 9    now?
10              MS. NORMAN:  Do what?
11              MR. BITGOOD:  Do you want me to give them
12    to the court reporter now?
13              MS. NORMAN:  No.
14              MR. BITGOOD:  Okay.
15         Q.  (BY MR. BITGOOD)  Ms. Riede, do you happen to
16    know how the attachment and the complete email that
17    was -- that was sent to you on August 17th became only a
18    question mark and there was no attachment?  Did you
19    remove the attachment?
20         A.  I sent it from my phone.  I don't know if the
21    phone stripped the attachment or not.
22         Q.  Okay.
23              MR. BITGOOD:  Let me see the exhibit again.
24    The one I just used.
25         Q.  (BY MR. BITGOOD)  Now, the email, which is
```

1   Defendants Exhibit 8, is the email that I sent to you.

2   And it begins by saying "There will be no credible or

3   plausible deniability to what these people have done" --

4                   THE COURT:  You're going too fast.  Start

5   over again.

6                   MR. BITGOOD:  Thank you, Your Honor.

7        Q.  (BY MR. BITGOOD)  "There will be no credible or

8   plausible deniability to what these people do, have been

9   doing, and have done and been getting away with by using

10  the Sugar Land Police Department as their strong arm

11  locally, thanks to Brice Beale's e-mail, the confession

12  as to what Hoover-Slovacek does and has been doing for a

13  long time."  So you're going to stop.  Okay?

14                  Attached to this is the same exhibit that

15  you have, right, a status report?  Is that the title of

16  the document?

17       A.  It does not say "Status Report" next page.

18       Q.  Does it say "Time Line and Chronology" on page

19  1?

20       A.  Yes.

21       Q.  Okay.  Following that time line and

22  chronology -- those two exhibits, Defendants Exhibit 8

23  and Exhibit 8 A, is there anywhere in that document the

24  time line or chronology for the email that was sent to

25  you where I offer you any mediation or legal services?

1       A.   No.   You just represented yourself as being

2   Lewis Brisbois Bisgaard & Smith.

3       **Q.   Okay.   But for clarity, and so the judge can**

4   **hear it, again, nowhere in that exhibit that I offer you**

5   **legal or mediation services, correct?**

6       A.   That's correct.

7            **MR. FISHER:**   Objection, form.

8       **Q.   (BY MR. BITGOOD)   Ms. Riede, regarding the**

9   **email that was sent to you along with that status report**

10  **you do agree that there was a great deal of problems**

11  **going on between myself, a Richard Pete Jones, and some**

12  **other residents of Imperial Lofts in Sugar Land, Texas,**

13  **correct?**

14      A.   I don't agree.

15      **Q.   Okay.**

16      A.   I was not familiar with those facts.

17      **Q.   Okay.   When you sent Ms. Norman an email in**

18  **October of that same year I believe, you told her you**

19  **didn't know anything about it and you couldn't comment**

20  **on it because the police chief had not referred it to**

21  **you.   Do you remember that?**

22      A.   I vaguely remember getting an email and a phone

23  call demanding to talk about an IA, and my police

24  department said no IA was conducted.

25      **Q.   Okay.**

Page 12

```
 1        A.  Or asked for.
 2        Q.  And IA, that's being internal affairs, correct?
 3        A.  Yes.
 4        Q.  Give me a moment to locate an -- give me a
 5   moment to locate an exhibit, please.
 6               Before I show you this exhibit, regarding
 7   the email you just testified to, when you received that
 8   email what did you do with it?
 9        A.  Which email are you referring to?
10        Q.  The one that we just talked about, Defendants
11   Exhibit 8 A.
12        A.  The question mark?
13        Q.  Yes, ma'am.
14        A.  When I received it from you, I forwarded it to
15   Norman Giles with a question mark.
16        Q.  Okay.  Did you have any conversations with
17   Norman Giles regarding this email?
18        A.  I received a phone call after I sent the email.
19        Q.  From who?
20        A.  It was two individuals at Lewis Brisbois.  I
21   remember it being Bill Helfand.  I do not remember the
22   other individual.
23        Q.  Okay.  What did y'all talk about?
24        A.  We talked about this document.
25        Q.  Okay.  You just did say "this document."  Did
```

1    **you talk about the content, how it was received, the**
2    **context?**
3         A.   I received it, and I said, "What's going on?
4    Are you now hiring these individuals, and do you have a
5    mediation practice in Fort Bend?  And this is a conflict
6    of interest because you represent my client, and this
7    appears to be a direct conflict with that."  And Bill
8    goes, "It's not legitimate, and we're going to handle
9    it."
10        Q.   Okay.
11        A.   And I said, "Thank you."  And then I promptly
12   forgot about it.
13             MS. NORMAN:  I'm handing page -- deposition
14   Exhibit 32 A, pages 186 of 191.
15             MR. FISHER:  You have a copy for me?
16             MS. NORMAN:  No, I don't.
17             THE WITNESS:  You go ahead and look.  You
18   read faster than I do.
19             MR. VIADA:  Okay.
20        Q.   (BY MR. BITGOOD)  **Ms. Riede, the exhibit that**
21   **Mr. Fisher just handed you is an exhibit that's already**
22   **been admitted into evidence in this case.  I want to ask**
23   **you a couple of questions about this.  It's dated March**
24   **25th, 2022.  Do you recall receiving this letter from**
25   **me?**

Page 14

```
 1          A.   Vaguely.

 2          Q.   You see this -- in the middle of the page it

 3    gives you a style and a case number, 22-CCV-070378,

 4    Jones versus Martinez.  You see that there?

 5          A.   I do.

 6          Q.   Okay.  And in the content of this letter --

 7    correct me if I'm wrong -- the grievances are against

 8    the City of Sugar Land and your police department; is

 9    that correct?  Would that be a fair statement?

10                MR. FISHER:  Excuse me, Your Honor.  This

11    has nothing to do with the lawsuit that we're here

12    about.  This is a substantive letter about some other

13    matter, a letter that was written by Mr. Easton to

14    Ms. Riede about something that's completely outside the

15    purview of the lawsuit that involves the use of our name

16    and the Lanham Act violations we're alleging.  If I

17    could show this document to the Court.

18                THE COURT:  For the record state your name,

19    please.

20                MR. FISHER:  Bennett Fisher on behalf of

21    Lewis Brisbois Bisgaard & Smith.

22                THE COURT:  Your response?

23                MS. NORMAN:  Yes, Your Honor.  This

24    lawsuit, 070378, is central to the motion for summary

25    judgment that Lewis Brisbois Bisgaard & Smith filed
```

```
 1    against Mr. Easton, myself, and Mr. Beers.  This relates

 2    to that lawsuit --

 3                THE COURT:  What's the relation --

 4                MS. NORMAN:  -- and --

 5                THE COURT:  What's the relationship?

 6                MS. NORMAN:  I'm sorry?

 7                THE COURT:  What is the relationship?  How

 8    does it relate?

 9                MS. NORMAN:  How does it relate?  The

10    actions that -- part of the actions that were taken in

11    this -- in the state court case which they seek to

12    overturn involve City of Sugar Land using its

13    police depart -- its police to adversely effect

14    Mr. Jones and Mr. Bitgood in that case.  So that case

15    is -- the motion for summary judgment they've got at

16    least I think 26 exhibits related to that case, and this

17    is part of that case.

18                MR. FISHER:  Judge, there's nothing in here

19    that mentions any actions by Lewis Brisbois.  And,

20    regardless, it doesn't give them license to use the name

21    Lewis Brisbois Bisgaard & Smith in any context.  This

22    document talks about Imperial Lofts, Ms. Norman,

23    Mr. Jones, the police department of Sugar Land.  I don't

24    see anything in here -- and this document doesn't even

25    have our letterhead on it that they were usurping.
```

Page 16

```
1              THE COURT:  Your name, sir?

2              MR. DUNWOODY:  My name is Wallace Dunwoody,

3    Your Honor.

4              THE COURT:  Yes, sir?

5              MR. DUNWOODY:  The point here is that this

6    was a letter that was sent to Ms. Riede by Mr. Bitgood

7    well before the later -- so this one was sent in March

8    of '22.  And then later on in August of '22 is when

9    Mr. Bitgood sent the second email to Ms. Riede that had

10   the Lewis Brisbois letterhead on it.  But the point is

11   there was this prior communication between Mr. Bitgood

12   and Ms. Riede, and the fact that there was that earlier

13   communication should provide Ms. Riede with some

14   indication that Mr. Bitgood was not associated with

15   Lewis Brisbois regardless of what the letterhead said.

16             THE COURT:  I'll allow the question.  I'll

17   allow the question.

18             MR. BITGOOD:  Thank you, Your Honor.

19        Q.  (BY MR. BITGOOD)  Regarding this letter that

20   was sent, okay, is it safe to say that -- well, first of

21   all, were you aware that Lewis Brisbois, they were the

22   attorneys for the City of Sugar Land?  Correct?  You

23   mentioned a conflict of interest?

24        A.  They are one of the attorney -- the law firms

25   that our risk pool assigns our cases to, yes, so --
```

1      Q.   Okay.

2      A.   -- we have a longstanding --

3      Q.   Were you aware at any time that they were also

4   the attorneys for Nolan Real Estate and Imperial Lofts?

5      A.   No, the city was not a party to that lawsuit.

6      Q.   I didn't ask that question.  Were you aware

7   that --

8      A.   I said no.

9      Q.   Okay.  And in this document that's already been

10  admitted into evidence did you discuss this document

11  with anybody?

12     A.   I showed it to my city manager.  I had

13  explained it to the mayor because you had called me a

14  KGB officer.  And my mayor wanted to know why he was

15  getting this.

16     Q.   It also complains about the City of Sugar Land

17  attacking us, correct, on page 5?

18             THE COURT:  Why don't you clarify who "us"

19  is, Mr. Bitgood.

20             MR. BITGOOD:  I'm sorry, Your Honor.  That

21  would be Mr. Jones, myself, and Ms. Norman.

22     Q.   (BY MR. BITGOOD)  Page 5 at the top says "The

23  behavior of the Sugar Land Police Department, its

24  officers who accept these [sic] concessions from

25  Imperial Lofts to cover up multiple and ongoing criminal

1    behavior; behavior directed against the African-American

2    community" --

3                   THE COURT:  Too fast.  Too fast.

4                   MR. BITGOOD:  Too fast.  I'm sorry.

5         Q.  (BY MR. BITGOOD)  -- "behavior against the

6    African-American community is nothing short of shameful.

7    By attacking me, the one doggedly pursuing them, it is

8    obvious to all that if they take me out, their conduct

9    might be overlooked, especially since Officer Spencer is

10   helping them avoid detection by the Federal Government

11   by defrauding the 'CARES' act, and this is not a theory,

12   it is a FACT, not to mention the taxpayers of Fort Bend

13   County, Texas."  You see that there?

14        A.  I do.

15        Q.  Did you do anything about that besides discuss

16   it with the mayor?

17        A.  I did not.

18        Q.  Okay.  Ms. Riede, at some point you became

19   aware that I was indicted by the Fort Bend County grand

20   jury, did you not?

21        A.  You sent me an email saying as such, yes.

22        Q.  I sent -- I sent you an email saying I had been

23   indicted?

24        A.  I believe you sent me an email complaining

25   about something, and it was included in there.

Page 19

1          Q.  You wouldn't happen to have a copy of that

2     email that you claim I sent you?

3          A.  No, I do not.

4          Q.  Okay.

5               MR. FISHER:  Your Honor, this has nothing

6     whatsoever to do with either our lawsuit or the motion

7     for summary judgment.  This is an issue between

8     Mr. Bitgood and the judiciary of Fort Bend County, and

9     possibly tangentially Ms. Riede, but nothing to do with

10    Lewis Brisbois Bisgaard & Smith.  And to the extent

11    that Mr. Dunwoody even suggested a few minutes ago that

12    this would give Ms. Riede cause to know that Mr. Easton

13    and Ms. Norman were not associated with Lewis Brisbois,

14    that was in March of 2022, and it was months later that

15    the infringing emails were sent to Ms. Riede by

16    Mr. Bitgood.  But the question is now about --

17               THE COURT:  What's relevant about the

18    indictment?

19               MS. NORMAN:  Your Honor --

20               MR. BITGOOD:  I can't hear the judge.

21               MS. NORMAN:  Okay.

22               MR. BITGOOD:  Go ahead, Your Honor.  I

23    didn't hear you.

24               MS. NORMAN:  The -- I didn't hear your

25    question.

1     **THE COURT:**  My -- I'm trying to figure out
2   what is relevant about the indictment.
3     **MR. BITGOOD:**  State of mind, Your Honor.
4   Everything in that motion for sum -- and the motion that
5   we intend to file, which you're giving us leave to file,
6   that we're going to file, is going to bring up this
7   issue, that this was brought in bad faith.  We never had
8   bad intent.  Page after page after page they allege that
9   Beers, myself, and Ms. Norman did this with a nefarious
10  and bad intent.  We didn't have that --
11    **THE COURT:**  You're saying that the -- the
12  indictment against you has something to do with the --
13  the use of the firm's name?
14    **MR. BITGOOD:**  Yes, sir.  Every bit of it.
15    **THE COURT:**  How so?
16    **MR. BITGOOD:**  Because that's the cause of
17  the indictment.  Lewis Brisbois and their friends were
18  the ones who went to the grand jury and got me indicted.
19    **MR. FISHER:**  Objection, Your Honor.  That
20  assumes all kinds of facts that are not in evidence and
21  are absolutely denied, that we've denied by Mr. Helfand
22  in his deposition.  It was denied by me in my
23  deposition.  And I think if it was -- the question was
24  asked of Norman Giles in his deposition it was also
25  denied.

```
1          MS. NORMAN:  Your Honor, if I may.  The
2    plaintiff itself is the one who put Ms. Riede's name
3    into contention as a person with knowledge of relevant
4    facts.  We're entitled to explore the extent of her
5    knowledge of what we consider relevant facts related to
6    our motion for summary judgment in this case.
7          THE COURT:  What you have in front of you,
8    right?
9          MS. NORMAN:  No.  No.
10         MR. FISHER:  Judge, that's far beyond Rule
11   36 and the reason for this -- these depositions right
12   now.  But beyond that just because facts are alleged
13   doesn't mean necessarily that they can go so far afield
14   of this deposition in terms of harassing Ms. Riede about
15   questions that she has nothing to do with.  If there was
16   an indictment against Mr. Bitgood, and he wants to put
17   that into evidence, I don't think this is the time or
18   the place.
19         THE COURT:  Well, we're not going to have
20   more than one deposition of this witness.  I think he's
21   entitled to find out what this witness knows.  I'm going
22   to allow it.
23         MR. BITGOOD:  Thank you, sir.
24    Q.  (BY MR. BITGOOD)  Who did you discuss my
25   indictment with when I -- when the indictment was
```

1   returned?

2        A.  No one.

3        Q.  **You didn't talk to a Bennett Dodson?**

4        A.  I'm sorry.  I don't know who Bennett Dodson is.

5        Q.  **Okay.**

6        A.  I don't practice criminal law, so I don't talk

7   about that.

8              MR. BITGOOD:  Objection, nonresponsive.

9        Q.  **(BY MR. BITGOOD)  Do you know who a Bryce**

10  **Spencer is?**

11       A.  Yes.  He's one of our police officers.

12       Q.  **He's employed by the City of Sugar Land?**

13       A.  Yes.

14       Q.  **Would you take a look at Defendants Exhibit**

15  **No. 35 A?**

16             MR. BITGOOD:  That's your client, Bennett.

17  Bennett doesn't even know who his client is.

18       Q.  **(BY MR. BITGOOD)  Could you tell the Court what**

19  **Exhibit No. -- it's Exhibit -- Defendants Exhibit 35 A,**

20  **as in Adam.  Tell the Court what that is.**

21       A.  It appears to be a W-2 from NRES Management to

22  Bryce Andrew Spencer.

23       Q.  **Okay.  So that's the same Bryce Andrew Spencer**

24  **that's employed by the City of Sugar Land, correct?**

25       A.  I have no idea.

Page 23

1    Q.  You just testified he's one of your police

2  officers.

3    A.  I have a police officer named Bryce Spencer.  I

4  don't know his middle name, I don't know his address,

5  and I don't know his Social Security number.

6    Q.  Okay.  And that 1099 comes from an outfit

7  called NRES?

8    A.  That's what it appears, yes.

9    Q.  And NRES, do you know what it stands for, those

10  initials?

11    A.  I do not.

12    Q.  Nolan Real Estate Services?

13    A.  Okay.

14    Q.  And owners of Imperial Loft, clients of Lewis

15  Brisbois?

16    A.  I am not familiar with any of this.

17    Q.  Okay.  Ma'am, would you like to -- once again,

18  this is not a 1099?  This is a W-2, correct?

19    A.  Yes, a W-2.

20    Q.  And that makes Bryce Andrew Spencer an employee

21  of Nolan Real Estate Services, correct?

22    A.  It appears so, yes.

23    Q.  Okay.  So what we have, if it's the same Bryce

24  Andrew Spencer that's employed by your police

25  department, he's also employed by Imperial Loft as a

Page 24

```
 1    full-time W-2, correct?
 2         A.  I'm not familiar enough with this type of
 3    document to be able to answer that.
 4         Q.  You don't know what a W-2 is, a tax document?
 5         A.  I know what a W-2 is, but I am a municipal
 6    attorney, not a tax attorney.  I can't tell you what --
 7    this indicates full-time, part-time.  I don't know.
 8         Q.  Okay.  But if it's the same police officer,
 9    he's also employed by NRES, correct?
10         A.  If it is, yes.
11         Q.  And you don't see a problem with that?
12         A.  No.  Our officers have a number of outside
13    employment jobs.
14         Q.  He also happens to be the same officer that
15    engineered the indictment.  You're aware of that,
16    correct?
17         A.  I am not aware.
18         Q.  You're not aware.  I'm handing you what's been
19    marked as Exhibit 38 C.  I believe it's a letter you
20    wrote to the Attorney General of the State of Texas in
21    an attempt to block my attempt to get the body cam of
22    Officer Spencer and the Lewis Brisbois client Madam
23    Sullivan.  See if you remember that.
24         A.  I do.  This is my letter.
25         Q.  And what was the letter written for?
```

1      A.  You made an open records request.  You did not

2   supply all the information required by the occupations

3   code to get some of the documents you requested, so

4   pursuant to state law I have to ask the Attorney

5   General's opinion on whether or not you receive the

6   information.

7      **Q.  And a week later the Sugar Land Police**

8   **Department gave me the body cam video anyway, correct?**

9      A.  I don't know.

10          MR. BITGOOD:  We can start with the orders

11   now.  Go ahead and take that one.

12          MS. NORMAN:  Can I have the pages of 185?

13   Thank you.  Which one do you want?  Thank you, ma'am.

14          MR. FISHER:  All those exhibits need to be

15   recorded by the court reporter.  So if you take them

16   back then --

17          MS. NORMAN:  They're going to be recorded

18   by the court reporter.  He's getting them

19   electronically.  Let me give those to her.

20          MR. BITGOOD:  Okay.

21          MS. NORMAN:  Page 9.

22      **Q.  (BY MR. BITGOOD)  I'm handing you -- excuse me.**

23   **I'm handing you what's been marked as Defendants Exhibit**

24   **32 A, as in Adam.  I want you to take a look at those**

25   **pages, please.**

1           MR. FISHER:  What's the exhibit number?

2           MR. BITGOOD:  32 Adam.

3           THE COURT:  Are we done?

4           MR. BITGOOD:  She's reading the exhibit,

5    Your Honor.

6           Mr. Fisher, you've seen these.  Please.

7      Q.  (BY MR. BITGOOD)  Ms. Riede, do you recall

8    getting a copy of those from me?

9      A.  If you say you sent it, I believe you.

10     Q.  But before we get there, on the other exhibit

11   we spoke about your letter to Ken Paxton.  You just told

12   the Court that the reason you refused to give the body

13   cam is because it didn't meet certain exemptions or we

14   didn't do the document request correctly.  I want to

15   bring your attention the one last paragraph you put in

16   here.  "This case has been appealed to the Fourteenth

17   Court of Appeals and is pending review.  At this time,

18   the release of the requested information could interfere

19   with the investigation of this case if the information

20   was released to the public."

21          I asked you earlier did you know a Bennett

22   Dodson.  Do you want to change your answer?

23     A.  I still don't recall who that is.

24     Q.  Okay.  How would you know this case was

25   appealed to the Fourteenth Court of Appeals?

1      A.  You go onto the county's website, something

2  called tylerpaw, and you look up the case, and it tells

3  its status.

4      **Q.  Regarding 32 Adam would you please read the**

5  **style of the case?**

6      A.  Richard P. Jones, Michael Joseph Bitgood a/k/a

7  Michael Easton and Lewis Brisbois Bisgaard & Smith LLP,

8  a Texas Domestic LLP versus Karina Martinez, Marianna

9  Sullivan, Imperial Lofts, LLC, David Oubre, Chinasa -- I

10  apologize.  I don't know how to pronounce his last name.

11  Og -- Ogbureke?

12      **Q.  Uh-huh.**

13          **THE COURT:**  Why don't you spell those for

14  the court reporter.

15      A.  O-G-B-U-R-E-K-E.  And Lewis Brisbois Bisgaard &

16  Smith LLP, a California foreign LLP.

17      **Q.  (BY MR. BITGOOD)  So with this pleading dated**

18  **September 13th you are aware that there is a Lewis**

19  **Brisbois Bisgaard & Smith, a Texas domestic LLP,**

20  **correct?**

21      A.  That's what the style appears, yes.

22      **Q.  And there's now a Lewis Brisbois Bisgaard &**

23  **Smith, a California LLP, correct?**

24      A.  That's what the style appears, yes.

25      **Q.  Okay.  Let's take a look at the content of the**

Page 28

1   order on page 2.

2                  **MR. FISHER:**  Objection.  This is that same

3   September 13th, 2022 court order that the Court

4   concluded a couple of weeks ago when we were here we've

5   already seen enough of that.  It really bears no

6   relationship to the violation of the Lanham Act that

7   we're here about in this courtroom.  And it does seem to

8   be to be used, to me, to be used to annoy and harass and

9   not to discover anything that could possibly be

10  admissible later.

11                 **THE COURT:**  Your response?

12                 **MS. NORMAN:**  Yes, Your Honor.  This is part

13  of a set of exhibits which have already been admitted

14  into evidence in this federal case.  And the use of the

15  name is central to their purported Lanham --

16                 **THE COURT:**  Well, how does this witness

17  have any knowledge to bring to bear on that?  How does

18  this witness know anything about the use of Lewis

19  Brisbois?

20                 **MS. NORMAN:**  Because her knowledge was

21  referenced by Mr. Helfand in a filing to this court and

22  a filing to the court of -- Fifth Circuit Court of

23  Appeals, saying that the letter, the original

24  chronology, she's got knowledge that Mr. Bitgood offered

25  mediation services to the City of Sugar Land, which she

```
 1   says she didn't read that in there, but the --
 2               THE COURT:  You want me to stipulate to
 3   that, that he did?
 4               MS. NORMAN:  That he did?  No.  He did not.
 5               THE COURT:  That he did not, then?  Can we
 6   stipulate he did not?
 7               MR. BITGOOD:  Yes, Your Honor, if we can
 8   get them to stipulate that I made no such offer.
 9               MR. FISHER:  No, I'm not going to stipulate
10   to that.  To me any time you send somebody a document
11   with your letterhead on it, or you hand out a business
12   card that is advertising, that is offering services.
13   And that's what they did when they sent that to
14   Ms. Riede.
15               THE COURT:  Mr. Dunwoody?
16               MR. DUNWOODY:  Your Honor, the fact that
17   there was this prior existing antagonistic relationship
18   between Mr. Bitgood and the City of Sugar Land and the
19   attorneys there tends to show that when she received an
20   email from Mr. Bitgood in August of '22 that it was not
21   likely that she was confused about, A, who he is, and,
22   B, whether or not he was genuinely operating any kind of
23   mediation or arbitration services to her.  So that
24   history between the two of them is important in painting
25   the context of how you got to view that August '22
```

Page 30

1  email.  Without the history you don't have the context

2  that really shows that there's no -- no legitimate

3  chance that Ms. Riede received the email from

4  Mr. Bitgood and thought "oh, he's offering me mediation

5  and arbitration services."  It's -- it's not believable.

6  And the history is important for giving context to show

7  that.

8            MR. FISHER:  Judge, we've already heard

9  testimony from the witness as to what she did get and

10  what she did send.  Now they're showing her a document

11  that has nothing to do with the City of Sugar Land and

12  nothing to do with the attorney for the -- the City of

13  Sugar Land.  And they're doing it time and time again

14  just to try and prejudice the Court I guess or waste our

15  time.  This had nothing to do with what we're here for.

16  That's another lawsuit in county court that is still

17  subject to appeal once the mandate is sent back from the

18  Court of Appeals.

19            MR. BITGOOD:  Your Honor, may I be heard

20  briefly?

21            THE COURT:  Sorry?

22            MR. BITGOOD:  May I be heard briefly?

23            THE COURT:  Yes, you may.

24            MR. BITGOOD:  This document, Your Honor,

25  indicates that there's a lawsuit pending between the

Page 31

1  Lewis Brisbois Texas domestic, which has been dissolved.

2  And at the time that this was done there was a lawsuit

3  pending between Lewis Brisbois Texas, Lewis Brisbois

4  California.  She got that before that email was sent to

5  Giles, and she got it before she sent this letter to the

6  Attorney General.  What I want to question her on is

7  this: at what point did she come to realize that there

8  were two Lewis Brisboises, and was anybody offering her

9  legal --

10            THE COURT:  Well, ask her that.  Can you

11  answer that question?

12       Q.  (BY MR. BITGOOD)  Can you answer that,

13  Ms. Riede?

14       A.  That was two questions.  Can I answer them

15  separately?

16       Q.  Yes.

17            THE COURT:  Yes, you may.

18       A.  Okay.  The first question is when did I come to

19  realize there were two Lewis Brisbois?

20       Q.  (BY MR. BITGOOD)  Uh-huh.

21       A.  That would be when I sent this email to Norman

22  with the question mark trying to figure out why they

23  hired you because I thought it was a conflict of

24  interest.  And they said, "No, we did not hire you."

25  And I said, "Why are you suing yourselves?"  And they

Page 32

1   told me not to worry about it, they had it under

2   control.  I believe they had it under control even

3   though you continued to send me these documents where it

4   appears that Lewis Brisbois is sending them to each

5   other, but I relied on my past history with them.  And I

6   don't know why you kept sending me these.

7        **Q.  Okay.  So you -- you claimed that they told you**

8   **they had it under control, correct?**

9        A.  It was not for me to resolve.  It was for them

10  to resolve.

11            THE COURT:  Yeah, I don't think this

12  witness can help on that.  I really don't.

13            MR. BITGOOD:  Okay.

14            THE COURT:  Let's move on.

15       **Q.  (BY MR. BITGOOD)  So on August -- that was**

16  **August seven -- what day did you send the -- the**

17  **conversation that you just spoke about, what day did**

18  **that take place?**

19       A.  August 17th or 18th of 2022.

20       **Q.  Okay.  So, now what I've handed you comes a**

21  **month later.**

22       A.  Where you're still using the name, yes.

23       **Q.  Okay.**

24            THE COURT:  Okay.  Let's move on.

25            MR. BITGOOD:  Thank you, sir.

Page 33

1          Q.   (BY MR. BITGOOD)   Would you look at page 2
2     of --
3                    MR. BITGOOD:   That would be document six?
4                    THE COURT:   What's this question about now?
5     I thought we were going to move on.
6                    MR. BITGOOD:   Your Honor, I want to point
7     out that the -- the court in Fort Bend County said that
8     they didn't have authority to appear in Fort Bend County
9     court.
10                   MR. FISHER:   Your Honor, once again, that's
11    got nothing to do with this lawsuit here.  It's subject
12    to appeal still.  And this witness has nothing to do
13    whatsoever with whatever it is that an associate judge
14    in Fort Bend County said on a particular day.
15                   THE COURT:   Yeah, I agree.  It's not --
16    it's not -- this witness can't help us on that.  Maybe
17    you have another witness that can help.  Let's move on.
18         Q.   (BY MR. BITGOOD)   So I want to summarize to be
19    clear.  Nothing that I sent you offered mediation or
20    legal services to the City of Sugar Land, correct?
21                   MR. FISHER:   Asked and answered.
22                   THE COURT:   Yeah, that's -- that's already
23    been asked and answered.  Let's move on.  I think it's
24    redundancy.
25                   MR. BITGOOD:   Pass the witness, Your Honor.

```
 1                    THE COURT:  Any questions from any other
 2    counsel?
 3                    MS. NORMAN:  Yes, Your Honor.
 4                    THE COURT:  Okay.
 5                         EXAMINATION
 6    BY MS. NORMAN:
 7        Q.  Ms. Riede, does the City of Sugar Land permit
 8    its -- I think you just testified the City of Sugar Land
 9    permits its police officers to have extra jobs?
10        A.  Yes.
11        Q.  Okay.  And those have to be approved by the
12    city via the police department, correct?
13        A.  Yes.
14        Q.  Okay.
15        A.  There's a standing list that's coordinated
16    through the police department.
17        Q.  I'm sorry?
18        A.  It's coordinated through the police department.
19        Q.  Okay.  So when -- when an employee of the
20    police department has an additional employee job that's
21    not as a subcontractor or not as an independent
22    contractor, does the city find that to be a conflict of
23    interest?
24                    MR. FISHER:  Judge, this has nothing to do
25    whatsoever with the lawsuit that we're here about.
```

1  That's a question about the City of Sugar Land's policy

2  with respect to whether police can possibly take on

3  other jobs --

4            **THE COURT:**  She's already said they can,

5  and they have.  So let's move on.

6            **MS. NORMAN:**  Pass the witness.

7            **THE COURT:**  Any more questions?

8            **MR. DUNWOODY:**  Yes, Your Honor.

9                      EXAMINATION

10  BY MR. DUNWOODY:

11      **Q.  Ms. Riede, my name is Wallace Dunwoody.  I**

12  **represent Brad Beers.  So how long have you worked for**

13  **the City of Sugar Land?**

14      A.  Twenty-one years.

15      **Q.  Okay.  And during that time how long has Lewis**

16  **Brisbois been doing legal work for the City of Sugar**

17  **Land?**

18      A.  I can't answer that.  Our risk pool, we used

19  Bill Helfand and Norman Giles and a number of the other

20  attorneys from different law -- as they've moved from

21  law firms.  I don't know if we used Lewis Brisbois prior

22  to them taking this case.  It's just whatever my risk

23  pool assigns.

24      **Q.  Okay.  For as long as you can recall?**

25      A.  For as long as I can recall we have used Bill

1   Helfand and Norman Giles.

2       Q.  And you and Mr. Giles went to law school

3   together; is that right?

4       A.  Yes.

5       Q.  So you've known him over 20 years?

6       A.  Okay.  Yes.

7       Q.  How do you know Mr. Bitgood?

8       A.  Via emails.

9       Q.  When was the first time you became acquainted

10  with Mr. Bitgood?

11      A.  By email?

12      Q.  Yeah.  In any way.

13      A.  I don't recall.  Probably -- well, I'd just be

14  guessing.

15      Q.  Well, we saw emails that were at least as early

16  as March of '22.  Was there stuff before that?

17      A.  I -- yes.  I would say yes.

18      Q.  Okay.  And what was your impression of him?

19      A.  He was an unhappy person.

20      Q.  Can you explain what you mean by "unhappy"?

21      A.  He was very creative in his responses to the

22  city, and it does not come across as an ordinary citizen

23  when they're unhappy.  He was very passionate.

24      Q.  Okay.  Can you give us an example of what it

25  was that gave you that impression?

Page 37

```
 1        A.   Sometimes his emails are over-the-top.
 2        Q.   Did you -- what do you mean by "over-the-top"?
 3        A.   You going to make me go there?  He sent emails
 4   alleging that I'm a secret agent, I work for the KGB,
 5   and I have a secret decoder ring, among others.
 6        Q.   Did that stand out to you as unusual?
 7        A.   Yes.
 8        Q.   Was there any chance that you were going to be
 9   interested in using his mediation or arbitration
10   services?
11        A.   That wasn't my concern.  My concern was that
12   the law firm I used had hired him.
13        Q.   Right.  But you've -- there was no way that you
14   were going to use Mr. Bitgood's mediation or arbitration
15   services?  Fair?
16        A.   In a roundabout way, yes, that's fair.
17        Q.   And you considered -- based on the emails that
18   you had received previously you've had an antagonistic
19   relationship with Mr. Bitgood?  True?
20        A.   I -- I wouldn't say it was antagonistic from my
21   side.  I routinely get emails from residents and other
22   people that seem to be that unusual.
23        Q.   Okay.  But the KGB decoder ring stood out to
24   you?
25        A.   This is the first time I've been accused of
```

```
 1   being a Russian spy.  Yes.
 2        Q.  And you didn't like that?  Fair?
 3        A.  I thought it was funny.
 4        Q.  And did you talk with other people at work
 5   about having received that email?
 6               MR. VIADA:  It's attorney-client.
 7        A.  That's attorney-client.
 8        Q.  (BY MR. DUNWOODY)  The fact that you -- whether
 9   or not you talked with somebody is attorney-client
10   privilege?  I don't think that's true.
11        A.  Yes, I did.
12        Q.  And who did you talk with about it?
13        A.  Since he went ahead and blind copied my city
14   council I had to talk to them, my city manager, and my
15   mayor.
16        Q.  Did you consider that to be embarrassing?
17        A.  No.
18        Q.  Has Mr. Bitgood ever offered you any kind of
19   good?
20        A.  Define "good."
21        Q.  Anything that he was going to sell to you?
22        A.  To sell to me, no, not exactly.
23        Q.  Okay.  And never offered you any kind of
24   service?
25        A.  Yes, he has.
```

ADD

1    Q.  What service did he offer you?

2    A.  After I apologized to Mr. Healey, he sent me a

3    very nice email praising me and offering to help me any

4    time I needed it in the future.

5    Q.  What kind of service was he offering to you?

6    A.  That's all it said.  Any time -- any way to

7    help me in the future.

8    Q.  Okay.  What kind of service did you think that

9    was?

10   A.  I didn't really spend much time thinking about

11   it.  I just put it in the slide folder, like I do all of

12   his emails.

13   Q.  And when was that?

14   A.  I don't recall.  Probably over the summer.

15   Q.  Sometime in the summer of '22?

16   A.  Yes, I believe so.

17   Q.  And you had conversations with Bill Helfand at

18   Lewis Brisbois after you got the email from Mr. Bitgood

19   in August of '22?

20   A.  Yes.

21   Q.  And did you genuinely ask Mr. Helfand if he had

22   hired --

23   A.  Yes, I did.

24   Q.  And you asked him if he had hired him.  Was

25   that a serious question?

Page 40

```
 1        A.   It was a frustrating question.
 2        Q.   Were you -- was it sort of a joke?  Were you
 3   asking in jest?
 4        A.   It was not in jest.
 5        Q.   Surely you didn't believe that Lewis Brisbois
 6   had hired Mr. Bitgood.
 7        A.   I would like to have thought that was my
 8   mindset that day.  But, no, I was concerned that they
 9   might have actually hired him.  I would not think that
10   they would have filed this name and used it with the
11   court if they had not hired him, if he did not have the
12   right to use that name.
13        Q.   Okay.  And that would have been concerning to
14   you if Lewis Brisbois had hired Mr. Bitgood?
15        A.   It would have been a conflict of interest.
16   Yes.
17        Q.   But also concerning to you?
18        A.   Any conflict of interest to my client is a
19   concern to me.
20        Q.   And you had no intention of having a law firm
21   do work for the City of Sugar Land if Mr. Bitgood worked
22   for that law firm?
23        A.   In light of the case that was attached, since
24   that was my client, that's correct.  I would not
25   continue to use them.
```

```
1         Q.  And how long did -- how long was the
2    conversation with Mr. Helfand?
3         A.  I don't remember.
4         Q.  Was it a 30 minute call?  Was it a 5 minute
5    call?
6         A.  Between 5 and 30 minutes.  Probably closer to
7    30.
8         Q.  And at the end of that call was there any
9    confusion in your -- in your mind as to whether or not
10   Mr. Bitgood worked for Lewis Brisbois?
11        A.  No.
12              MR. DUNWOODY:  I'll pass the witness.
13              THE COURT:  Any more questions?
14              MR. BITGOOD:  Redirect, Your Honor.
15              MR. FISHER:  No questions, Judge.
16              THE COURT:  We got any other witnesses?
17              MR. BITGOOD:  Just -- just two more
18   questions, Your Honor, so the judge will know.
19                        EXAMINATION
20   BY MR. BITGOOD:
21        Q.  On page 2 of this letter of March 25th, 2022, I
22   write "If I did not know better, your email would lead
23   the reader (and there will be plenty of readers) to
24   believe that you actually represent the KGB, and that
25   the officers involved are 'secret' agents whose
```

```
 1   identities must be preserved at all costs for 'Mother'
 2   Sugar Land, rather than the very public law-enforcement
 3   agency, whose officers are public servants, not
 4   under-cover enforcers for private entities."  In that
 5   context is anybody calling you names, a KGB agent?
 6                 THE COURT:  Did what?
 7        Q.  (BY MR. DUNWOODY)  In that context did you
 8   believe you were being called a KGB agent?
 9        A.  In that context I realized I was not dealing
10   with a stable person.
11                 MR. BITGOOD:  Pass the witness, Your Honor.
12                 THE COURT:  Okay.  Can we adjourn?
13                 MR. DUNWOODY:  Yes, sir.
14                 MR. BITGOOD:  Yes, Your Honor.
15                 THE COURT:  Thank you very much.
16                 (Whereupon at 12:26 p.m. the
17                 deposition was concluded.)
18
19
20
21
22
23
24
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1                   CHANGES AND SIGNATURE

 2            WITNESS NAME:  MEREDITH R. RIEDE

 3          DATE OF DEPOSITION:  APRIL 1, 2024

 4   PAGE LINE                    CHANGE              REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1            I, MEREDITH R. RIEDE, have read the foregoing
      deposition and hereby affix my signature that same is
 2    true and correct, except as noted above.
 3
 4
                        _____
 5                      MEREDITH R. RIEDE
 6
 7
      THE STATE OF _____)
 8    COUNTY OF _____)
 9
10
              Before me, _____, on
11    this day personally appeared MEREDITH R. RIEDE, known to
      me (or proved to me under oath or through
12    _____) (description of identity
      card or other document) to be the person whose name is
13    subscribed to the foregoing instrument and acknowledged
      to me that they executed the same for the purposes and
14    consideration therein expressed.
              Given under my hand and seal of office this
15    _____ day of _____, _____.
16
17
                        _____
18                      NOTARY PUBLIC IN AND FOR
                        THE STATE OF _____
19                      COMMISSION EXPIRES: _____
20
21
22
23
24
25
```

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF TEXAS
 2                  HOUSTON DIVISION
 3
     LEWIS BRISBOIS BISGAARD &   §
 4   SMITH, LLP,                 §
                                 §
 5        Plaintiff,             §
                                 §
 6   v.                          §
                                 § Case No. 4:22-cv-3279
 7                               §
     MICHAEL JOSEPH BITGOOD,     §
 8   a/k/a "Michael Easton,"     §
     et al.,                     §
 9                               §
          Defendants.            §
10
11
12              REPORTER'S CERTIFICATION
            DEPOSITION OF MEREDITH R. RIEDE
13                  APRIL 1, 2024
14
15       I, John G. Rochelle, Certified Shorthand Reporter
16   in and for the State of Texas, hereby certify to the
17   following:
18       That the witness, MEREDITH R. RIEDE, was duly sworn
19   and that the transcript of the oral deposition is a true
20   record of the testimony given by the witness;
21       That the deposition transcript was submitted on
22   _____ to the witness or to the attorney for
23   the witness for examination, signature and return to
24   Worldwide Court Reporters, Inc., by _____;
25       That the amount of time used by each party at the
```

Worldwide Court Reporters, Inc.
(800) 745-1101

```
 1   deposition is as follows:
 2        Mr. Bennett G. Fisher - 00:00
 3        Mr. William S. Helfand - 00:00
 4        Mr. S. Wallace Dunwoody IV - 00:07
 5        Mr. Michael Joseph Bitgood - 00:48
 6        Ms. Susan C. Norman - 00:01
 7        Mr. Ramon G. Viada III - 00:00
 8        That pursuant to information given to the
 9   deposition officer at the time said testimony was taken,
10   the following includes counsel for all parties of
11   record:
12        Mr. Bennett G. Fisher, Mr. William S. Helfand,
13   Attorneys for Plaintiff, Lewis Brisbois Bisgaard & Smith
14   LLP;
15        Mr. S. Wallace Dunwoody IV, Attorney for Defendant,
16   Bradley Beers;
17        Mr. Michael Joseph Bitgood, Defendant Pro Se;
18        Ms. Susan C. Norman, Attorney for Defendant,
19   Richard P. Jones;
20        Mr. Ramon G. Viada III, Attorney for the Witness,
21   Meredith R. Riede.
22        That $_____ is the deposition officer's
23   charges to the Defendant, Susan C. Norman, counsel for
24   Richard P. Jones, for preparing the original deposition
25   transcript and any copies of exhibits.
```

1       I certify that a review of the transcript was
2   required by court order.
3       I also certify pursuant to the presiding judge the
4   federal read on by the reporter for the record was not
5   required.
6       I further certify that I am neither counsel for,
7   related to, nor employed by any of the parties or
8   attorneys in the action in which this proceeding was
9   taken, and further that I am not financially or
10  otherwise interested in the outcome of the action.
11      Certified to by me this 13th day of April, 2024.
12
13
14
15
                    _____
16                  JOHN G. ROCHELLE
                    Texas CSR No. 5644
17                  Expiration Date:  10/31/25
                    Worldwide Court Reporters, Inc.
18                  Firm Registration No. 223
                    12621 Featherwood Drive, Suite 290
19                  Houston, Texas 77034
                    (713) 572-2000
20
21
22
23
24
25