UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT COURT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| LEWIS BRISBOIS BISGAARD & | ) |
| SMITH, LLP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   Case No. 4:22-cv-3279 |
| | ) |
| MICHAEL JOSEPH BITGOOD a/k/a | ) |
| "Michael Easton," et, al | ) |
| | ) |
| Defendants. | ) |

ORAL DEPOSITION OF

WILLIAM SCOTT HELFAND

MARCH 13, 2024

ORAL DEPOSITION OF WILLIAM SCOTT HELFAND,
produced at the instance of Defendants, and duly sworn,
was taken in the above-styled and numbered cause on the
13th day of March 2024, from 2:45 o'clock p.m. to 4:55
o'clock p.m., before Monica Victor, a certified
shorthand reporter, in and for the State of Texas,
reported by computerized stenotype machine, at 515 Rusk
St., Courtroom 3A, Houston, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

```
 1                          INDEX
 2                                              PAGE
 3   Appearances ......................................    4
 4        Examination by Mr. Bitgood ..................    5
          Examination by Ms. Norman ..................   106
 5        Examination by Mr. Dunwoody ................   111
          Examination by Ms. Bitgood ................   127
 6
          Correction Page ...........................   133
 7        Reporter's Certificates ...................   135
 8             EXHIBITS USED MARCH 13, 2O24, IN
               WILLIAM SCOTT HELFAND DEPOSITION
 9
     8   August 17, 2022, Bitgood, email to Meredith Riede w
10       Attachment Chronology Pleading Cause
         No. 22-CCV-070378 - Jones, et al v Martinez, et al
11       (No file stamp)
12   8A  Aug. 17, 2022, Filed Chronology Cause
         No. 22-CCV-070378 - Jones, et al v Martinez, et al,
13       pleading as attached to Riede email before filing
14   15  Sept. 13, 2022, Cause No. 22-CCV-070378 -
         Jones v Martinez Orders from September 13
15       2022, Ruling 12 Hearing
16   16  Sept. 19, 2022, Cause No.22-CCV-070378-Jones,
         et al,v Martinez, et al Supplemental filed to
17       4th Amended Petition
18   17  Sept. 23, 2022, Case No. 4:22-cv-03279;
         Dkt 1 - LBBS Complaint w Ex 1 - 1 Word Mark
19       3,722,172 and Dkt.35-2 Certified Cancellation of
         Word Mark 3,722,172
20
     21  October 6, 2022, Cause No.4:22-cv-03279 Transcript
21       of TRO Hearing
22   23A October 6, 2022, Cause No.4:22-cv-03279 Dkt 16
         Bitgood Ltr Pldg to Court - TXLB wound up & closed
23
     28  Oct. 14, 2022, Case No.4:22-cv-03279, Dkt-19-Bitgood
24       Motion to Dismiss Pursuant to the Texas Citizens
         Participation Act
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1                   EXHIBITS USED March 13, 2024, IN
                     WILLIAM SCOTT HELFAND DEPOSITON
 2                             (CONTINUED)
 3    33    Dec. 2, 2002 - Case No. 4:22-cv-03279 Excerpt
            Hearing Transcript - Bitgood 15 Exhibits admitted
 4
      33A   Dec. 2, 2022 - Case No. 4:22-cv-03279 List of
 5          Bitgood 15 Exhibits admitted
 6    38    Jan 18, 2023, Case No.14-22-000694, LBBS Motion
            to Dismiss Appeal (w. Ex 1-6)
 7
      39    April 21, 2023, Case No. 14-22-000694-CV, Helfand
 8          Ltr 14th COA
 9    43    May 2, 2023, Case No. 14-22-000694-CV - Grant
            Motion to Strike LBBS Motion to Dismiss Appeal
10
      46    Sept. 29, 2023 - Docket of Case No. 4:22-cv-03279,
11          Southern District of Texas
12    48    Sept. 29, 2023, Case No.4:22-cv-03279, LBBS Motion
            for Summary Judgment Exhibit 53 - Dkt 183-53 -
13          William Helfand for MJS
14    50A   Dec 5, 2023, Extract of Document 67, LBBS Brief
            Filed at Fifth Circuit in Appeal No. 23-20065,
15          with ROA 2550
16    57    Feb. 2, 2024 LBBS Attorney's Fee Bill in Case
            No. 4:22-cv-03279
17
      60    Mar. 7, 2024, Dkt 282 - Hon. Ellison Order for
18          Depositions
19
20
21
22
23
24
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1                   A P P E A R A N C E S
 2
        COUNSEL FOR PLAINTIFF LEWIS BRISBOIS
 3      BISGAARD & SMITH, LLP:
 4      Mr. William S. Helfald
        Mr. Bennett Fisher
 5      LEWIS BRISBOIS BISGAARD & SMTIH, LLP
        24 Greenway Plaza, Suite 1400
 6      Houston, Texas 77046
        Telephone: 713.659.6767
 7      Email: william.helfand@lewisbrisbois.com
 8
        COUNSEL FOR DEFENDANTS PRO SE:
 9
        Mr. Michael Joseph Bitgood
10      503 FM 359, Suite 130-116
        Richmond, Texas 77406
11      Telephone: 281.415.8655
        E-mail: east.pro.law.msn.com
12
        Susan Norman
13      P.O. Box 55585
        Houston, Texas 77255
14      Telephone: 713.882.2066
        Facsimile: 281.402.3682
15      E-mail: suenorman@suenormanlaw.com
16
        COUNSEL FOR DEFENDANT BRAD BEERS:
17
        Mr. S. Wallace Dunwoody
18      MUNCK WILSON MANDALA
        600 Banner Place Tower
19      12770 Coit Road
        Dallas, Texas 75251
20      Telephone: 972.628.3600
        Facsimile: 972.628.3616
21      Email: wdundy@munckwilson.com
22
23
24
25
```

1          **THE REPORTER:**  We are on the record.

2  Today's date is the 13th day of March, 2024.  The time

3  is 2:45 p.m.

4               This is the oral deposition of William

5  Helfand.  It is being taken in the matter styled United

6  States District Court, Southern District of Texas,

7  Houston Division, Lewis Brisbois Bisgaard & Smith versus

8  Michael Joseph Bitgood, a/k/a Michael Easton, et al.

9  Case No. 4:220-cv-3279.  The location of the deposition

10  is 515 Rusk Street, Courtroom 3A, Houston, Texas.  Would

11  Counsel state their appearances and locations.

12          **MR. FISHER:**  Bennett Fisher, B-E-N-N-E-T-T,

13  Fisher, F-I-S-H-E-R.  We're representing Lewis Brisbois

14  Bisgaard & Smith and I'm presenting Bill Helfand.

15          **MR. BITGOOD:**  Michael Joseph Bitgood,

16  defendant, pro se.

17          **MS. NORMAN:**  Good afternoon.  Susan Norman,

18  defendant, pro se.

19          **MR. DUNWOODY:**  Wallace Dunwoody here for

20  Brad Beers.

21               WILLIAM SCOTT HELFAND,

22  having been duly sworn, testified as follows:

23                    EXAMINATION

24  BY MR. BITGOOD:

25     Q.  **Would you state your name for the record, sir?**

Page  6

```
 1        A.   William Scott Helfand.
 2        Q.   Mr. Helfand, what do you do for a living?
 3        A.   I'm an attorney.
 4        Q.   With what firm, if any?
 5        A.   With Lewis Brisbois Bisgaard & Smith.
 6        Q.   Mr. Helfand, you brought this lawsuit which is
 7   the one we're taking your deposition in.  Is that
 8   correct?
 9        A.   No.
10        Q.   Who brought the lawsuit?
11        A.   Lewis Brisbois Bisgaard & Smith.
12        Q.   Were you the lead counsel?
13        A.   I am the lead counsel.
14        Q.   So you signed the first pleading that initiated
15   this lawsuit?
16        A.   I don't recall whether I did.
17        Q.   Are you lead counsel?
18        A.   I am lead counsel.
19             MR. BITGOOD:  You have a copy?
20        Q.   (BY MR. BITGOOD)  Page 21 of that original
21   petition filed on September 23rd, 2022 says signed,
22   William S. Helfand.  Is that you?
23        A.   May I see the copy?
24             MR. FISHER:  Can you please show him a copy
25   of the document you are reading from?
```

```
 1          Q.  (BY MR. BITGOOD)  Exhibit 17, I'm handing the

 2    witness.

 3          A.  Okay.  Looking at page 21, it does not say

 4    signed, William S. Helfand.  It has my name typed on the

 5    signature line which means, in answer to your question,

 6    I did not sign the complaint.  However, I authorized

 7    someone to put my name on the complaint where it is.

 8          Q.  And if anybody was to read that complaint, how

 9    would they know you gave an authorization?

10          A.  In this district, and generally in the federal

11    district courts, the slash S with the person's name is

12    permission to sign that name.

13          Q.  So you're claiming that this lawsuit signed in

14    the name of William S. Helfand was not signed by you but

15    you gave your permission to sign your name?

16          A.  No.

17          Q.  Who signed this petition?  Somebody had to sign

18    electronically or otherwise.

19          A.  No one signed that petition.  You can see it's

20    not signed at all.

21          Q.  It's an electronic signature.  Am I correct?

22          A.  No.  It's a typed name.

23          Q.  Is that how we sign pleadings in the Southern

24    District?

25          A.  That is one way to sign a pleading in the
```

Page 8

```
 1   Southern District.
 2       Q.  Did you elect to use that format to sign this
 3   pleading?
 4       A.  I authorized someone to do that with my name.
 5       Q.  Okay.  Thank you, sir.  I'm going to direct you
 6   to page 18 and paragraph 65.
 7               MR. FISHER:  Can you hand him a copy?
 8               MR. BITGOOD:  I'm going to get there.
 9       A.  It might be easier if you have a copy.  I'll
10   follow along because what I'm worried about is then I'll
11   have to try to confirm what you read to me.  Thank you.
12       Q.  (BY MR. BITGOOD)  Thank you.
13               THE REPORTER:  Is this an exhibit?
14               THE WITNESS:  No.  It's a pleading.
15               MR. FISHER:  Which paragraph?
16               THE WITNESS:  He said 65.  Right?
17               MR. BITGOOD:  Paragraph 65.
18               MR. FISHER:  Okay.  Thank you.  Tell me
19   when you're ready to flip the page.
20               THE WITNESS:  Ready.
21       Q.  (BY MR. BITGOOD)  In that paragraph you tell
22   the Court the need of a temporary restraining order.
23   Would you read paragraph 65 for me, please?
24       A.  "Because Defendants' commercial use of Lewis
25   Brisbois' name creates the likelihood of confusion,
```

1  irreparable harm is presumed.  Nonetheless, the harm to

2  Lewis Brisbois' goodwill is already apparent through an

3  order dated September 13th, 2022 disqualifying Lewis

4  Brisbois and David as counsel, the underlying lawsuit.

5  Lewis Brisbois faces a substantial threat of irreparable

6  harm if the Court does not issue a temporary restraining

7  order and preliminary injunction against Defendants."

8       **Q.  What underlying lawsuit are you speaking of in**

9  **your pleading?**

10      A.  It's probably defined here earlier.

11          **MR. FISHER:**  Mr. Easton, I'm going to

12  object.  This document speaks for itself.  It's a

13  pleading that was filed in this court a year and half

14  ago.

15          **MR. BITGOOD:**  And I'm asking him some

16  questions about his pleading.  Paragraph 65 I've

17  targeted to ask him those questions.  What underlying

18  lawsuit is he talking about.

19      A.  I understand your question.  Let me see if --

20  it should be defined earlier in the document or may be

21  defined.  We'll take a look.

22          **MR. FISHER:**  Do you have another copy?

23          **MS. NORMAN:**  No.

24          **MR. FISHER:**  No?

25          **MS. NORMAN:**  Huh-uh.

Page 10

```
1        A.   Okay.  Here it is where you see it the first
2   time.  Okay.  It's first identified in paragraph 17 on
3   page 5 of 21.  It says, "Defendants Michael J. Bitgood,
4   a/k/a 'Michael Easton' and Richard Jones sued Karina
5   Martinez, Marianna Sullivan, Imperial Lofts, LLC in
6   Texas state district court alleging, in part, that
7   Martinez, Sullivan, and Imperial Lofts had improperly
8   charged rental fees and filed eviction petitions against
9   Bitgood and Jones."  And that is what is referred to in
10  paragraph 65 as the underlying lawsuit.
11        Q.   Okay.  And in that paragraph, you tell the
12  Court that there was an order entered disqualifying
13  David -- and you meant to say David Oubre, I presume,
14  lead counsel at the time?
15        A.   I believe so.
16        Q.   And Lewis Brisbois.  Correct?
17        A.   Lewis Brisbois.
18        Q.   Okay.
19        A.   It's a person's name and his name is Brisbois.
20             MR. BITGOOD:  Objection, nonresponsive.
21        Q.   (BY MR. BITGOOD)  And you claim that order was
22  entered September 13th, that's per your pleading.
23  Correct?
24        A.   I don't claim anything.  It's stated in here
25  that the order was dated September 13th, 2022.
```

1        Q.  I'm handing you a copy of the orders that were

2    entered by the state court that day in that same case

3    you're talking about.  This will be Exhibit No. 15.

4                    MR. FISHER:  Objection, form.

5                    MR. BITGOOD:  For handing him a copy?

6                    MR. FISHER:  I'm objecting to anything that

7    has to do with a lawsuit that's not in this court and

8    has nothing to do with the Lanham Act action that we've

9    brought.

10                   MR. BITGOOD:  I am with you.  Hallelujah,

11   we agree.

12       A.  Can I have Defendants' Exhibit 15?

13       Q.  (BY MR. BITGOOD)  Show me in that, is there

14   anything in there that disqualifies David Oubre and the

15   law firm of Lewis Brisbois?

16       A.  Yes, the second paragraph --

17       Q.  And what was the disqualification, sir?

18       A.  Yes.

19       Q.  Okay.

20                   MR. FISHER:  You've got to answer --

21       A.  You've got to let me answer the question.

22                   THE COURT:  Let Mr. Helfand speak.

23       A.  The second paragraph, quote, "The motion to

24   show authority is granted.  David Oubre is removed as

25   counsel in this case for Imperial Lofts, LLC, Imperial

```
 1   Lofts Owner, LLC, Madam Marianna Sullivan and Karina
 2   Martinez.
 3        Q.  (BY MR. BITGOOD)  So that's what you consider
 4   an order of disqualification?
 5        A.  Yes.
 6        Q.  Do you know the difference between a Rule 12
 7   motion and an open motion to disqualify counsel?
 8        A.  A Rule 12 motion is a challenge to the
 9   authority of counsel to be qualified to represent a
10   party.
11        Q.  My question to you is, do you know the
12   difference between a motion to disqualify counsel and a
13   Rule 12 motion?
14        A.  Yes, I do.
15        Q.  Okay.  So your wording to the Court was there
16   was an order entered disqualifying.  Correct?
17        A.  That's what this order does.
18        Q.  Okay.  That order took place in state court.
19   Correct?
20        A.  It did.
21        Q.  Okay.  So if you raised your objection in state
22   court, state court would have been the proper place to
23   seek a remedy for that.  Would that be correct?
24        A.  I don't necessarily agree with you.
25        Q.  Okay.
```

Page 13

```
 1        A.  The objection to the action of the master is on
 2   its own and, as Mr. Fisher pointed out, it's unrelated
 3   to this lawsuit.  The use of the law firm's name is the
 4   basis of this lawsuit.  Those are two different things.
 5        Q.  But when you requested a temporary restraining
 6   order, you were talking about that lawsuit.  Correct?
 7        A.  No.
 8        Q.  What other lawsuit were you talking about?
 9        A.  The lawsuit that we're here about.
10        Q.  But in paragraph 65 you say Lewis Brisbois has
11   already been harmed by an order entered by the state
12   court on September 13th, 2022.  That's the lawsuit
13   you're referring to.  Correct?
14        A.  No.  Your predicate is incorrect.  That's not
15   what the pleading says and that's not what Lewis
16   Brisbois claimed.
17        Q.  Okay.
18        A.  Lewis Brisbois was harmed by your and
19   Ms. Norman's and Mr. Beers' conspiracy to use the law
20   firm's name in lots of places, including in this court,
21   in state court.
22             MR. BITGOOD:  Objection, nonresponsive.
23        Q.  (BY MR. BITGOOD)  So you're seeking the TRO
24   because of a state court order.  What case are you
25   seeking that order in?  This Court --
```

Page 14

```
 1              MR. FISHER:  Objection, form.
 2      A.  Your predicate is incorrect.  No one was
 3  seeking --
 4      Q.  (BY MR. BITGOOD)  Counsel, if you don't
 5  understand it, I will be glad to ask you again.
 6      A.  No, no.  I'm going to tell you you're wrong.
 7      Q.  Do you --
 8      A.  You're wrong.
 9              THE REPORTER:  One at time.
10      A.  -- a motion is wrong.
11              THE REPORTER:  I'm off the record.
12              THE COURT:  Stop.  Stop.  I think
13  Mr. Helfand is trying to respond to your question.  Let
14  him finish.
15      A.  Your predicate is incorrect.  What you just
16  said isn't in the papers nor was it alleged to the
17  Court, nor was it argued to the Court.  You've made up
18  something that's not in here.  If you ask me about
19  what's in here, I'll answer that, but no one sought a
20  temporary restraining order or filed this action because
21  of an order in state court.
22              MR. BITGOOD:  Let me see the pleading
23  again, please.
24      Q.  (BY MR. BITGOOD)  "Nonetheless, the harm to
25  Lewis Brisbois's goodwill is already apparent in the
```

 1   **order dated September 13th, disqualifying Lewis Brisbois**

 2   **and David as counsel in the underlying lawsuit." This**

 3   **is one of the reasons you pled for a temporary**

 4   **restraining order, is that correct, from Lewis Brisbois?**

 5            MR. FISHER:  Objection, form.

 6       A.  No, that's not one of the reasons that the firm

 7   sought a temporary restraining order.  That is a fact

 8   that supported the grounds for a temporary restraining

 9   order, one of many.

10       **Q.  (BY MR. BITGOOD)  And the style at the top of**

11   **the case is what you're complaining about?**

12            MR. FISHER:  Objection, form.  Which case?

13            MR. BITGOOD:  The underlying state court

14   lawsuit.

15       A.  I don't understand.

16       **Q.  (BY MR. BITGOOD)  Defendants' Exhibit 15, would**

17   **you read the style of the plaintiffs?**

18       A.  The style of plaintiff in Exhibit 15 is Richard

19   P. Jones, Michael Joseph Bitgood, a/k/a Michael Easton,

20   and Lewis Brisbois Bisgaard & Smith, LLP, a domestic

21   LLP, plaintiffs.

22       **Q.  (BY MR. BITGOOD)  The defendants now, please?**

23       A.  Oh, defendants?  Karina Martinez, Marianna

24   Sullivan, Imperial Lofts, LLC, David Oubre, O-U-B-R-E,

25   Chinasa Ogbureke -- and that's C-H-I-N-A-S-A

```
1    O-G-B-U-R-E-K-E -- Lewis Brisbois Bisgaard & Smith, LLP,
2    a California foreign LLP.
3         Q.  So the matter you're referring to in paragraph
4    65 is the matter you're holding in your hand, the same
5    case.  Correct?
6         A.  I don't know when you said "matter."  There's a
7    reference to an underlying lawsuit --
8         Q.  Underlying lawsuit in state court.
9         A.  That is the underlying law -- well, no.  The
10   underlying lawsuit was not styled as you just had me
11   read.  The underlying lawsuit was not styled that way.
12        Q.  The Court signed the order the way it's styled.
13   Correct?  Go to the last page.
14        A.  The judge signed the -- yes, the ancillary
15   judge or whatever they're called, the master in state
16   court signed the order.
17        Q.  We don't have the masters in state court.
18             MR. FISHER:  Associate judge.
19             THE REPORTER:  I didn't hear you.
20             THE WITNESS:  I said I don't know what they
21   call them, associate judge.  Mr. Fisher might know that.
22        A.  Associate judge has signed this.
23        Q.  (BY MR. BITGOOD)  Okay.  Would you go to the
24   next page of your exhibit?
25        A.  Yes.
```

Page 17

```
 1          Q.  Would you read the title of it?

 2          A.  Order Taking Judicial Notice.

 3          Q.  Was that also signed by the Court?

 4               MR. FISHER:  Objection, form.  What's the

 5    relevance of any of this?

 6               MR. BITGOOD:  Relevancy objections in a

 7    federal deposition that you beat me down when I tried to

 8    take that?

 9               MR. FISHER:  I'm trying --

10               MR. BITGOOD:  We're narrowed here -- let

11    him answer.

12               MR. FISHER:  You asked me a question.  I'll

13    answer your question.  We're here for our motion for

14    summary judgment.  You started out by going back to the

15    original petition.  Now you're going back to a lawsuit

16    in county court and orders in county court, none of

17    which have anything to do with the Lanham Act violation

18    that we've alleged in our petition and is the subject

19    for motion for summary judgment.  So I'd like to how

20    afield we're going to get.

21               MR. BITGOOD:  Not very far, Mr. Fisher, if

22    he'll answer my question.

23          A.  What's your question?

24               THE COURT:  Ask your question again,

25    please.
```

Page 18

1      Q.  (BY MR. BITGOOD)  Did the Court sign the order

2  taking judicial notice, yes or no?

3      A.  There's a signature on the second page of that

4  order, yes.

5      Q.  Would you hand me the document back?

6      A.  I should tell you, I found some more places in

7  here where the judge disqualified both Lewis Brisbois

8  and David Oubre if you want that.

9      Q.  Go ahead.

10     A.  Okay.  It's on what is page 4 of 5, paragraph

11 2, quote, "The Court removed Lewis Brisbois Bisgaard &

12 Smith --

13          THE COURT:  You're going too fast.  Slow

14 down.

15          THE WITNESS:  I'm so sorry.

16     A.  "The Court removed Lewis Brisbois Bisgaard &

17 Smith and David Oubre from the case."  And then

18 paragraph 3, "The Court removed Lewis Brisbois

19 Bisgaard & Smith, LLP and David Oubre."

20     Q.  (BY MR. BITGOOD)  On that page of that exhibit

21 you just read, there's an entry that says, Lewis

22 Brisbois Bisgaard & Smith California lacked authority to

23 appear in a Texas court on March 11th, 2002, and by

24 judicial admission admitted that they did not submit an

25 application to do business in Texas until at least March

Page 19

1    28th.

2                    MR. BITGOOD:  What are you going to tell

3    me?

4                    MS. NORMAN:  '22, 2022.

5         Q.  (BY MR. BITGOOD)  2022.  Okay.  Paragraph 4

6    says, "The only testimonial evidence put on at this

7    hearing was the sworn testimony of plaintiff Michael

8    Joseph Bitgood as the president of Lewis Brisbois

9    Bisgaard & Smith, LLP, a domestic Texas LLP.  Despite

10   the extensive testimony and narrative of Mr. Easton,

11   Mr. Oubre did not cross examine the plaintiff on any

12   matters that Easton testified to.  Thus, the Court

13   credits Mr. Easton's testimony as credible and

14   conclusive."  Did you see that?

15        A.  I did not see that.

16        Q.  Take a look at it, please.

17                    MR. FISHER:  Objection.  Your Honor, I

18   would object to this line of questioning as having

19   nothing to do with the motion for summary judgment or

20   the lawsuit that's in this court as a violation of the

21   Lanham Act.

22                    Mr. Easton just testified as to what he

23   says happened in a county court proceeding, not in this

24   proceeding, and he's asking Mr. Helfand to just confirm

25   that that's what was said.  I don't understand why --

Page 20

```
 1   what the relevance has here.  The Court's laid out

 2   parameters for this deposition, and I ask that the Court

 3   sustain my objection to this line of questioning and

 4   anything that has to do with the lawsuit in county

 5   court.

 6                THE COURT:  Okay.  Do you have an objection

 7   too?

 8                MS. NORMAN:  May I respond, Your Honor?  If

 9   this is about the motion for summary judgment, there are

10   62 exhibits to that motion for summary judgment.  And I

11   don't have my list in front of me, but fully at least 26

12   of the exhibits are the state court pleadings and

13   documents filed which are purported to support Document

14   183 which is the motion for summary judgment.  I believe

15   we are not going far afield.

16                THE COURT:  I'm going to allow it.  I'm

17   going to allow it.

18                MS. NORMAN:  Thank you, sir.

19        A.  Yes, you apparently read that correctly.

20        Q.  (BY MR. BITGOOD)  Next one says, After

21   Mr. Oubre rested his case -- after Mr. Oubre rested his

22   case, the Court took judicial notice of the contents of

23   the Court's file.  At no time in his case in chief did

24   Mr. Oubre ask the Court to take judicial notice of

25   anything.  At no time during his case in chief did
```

1    Mr. Oubre mark or offer a single solitary exhibit.  At

2    no time during his case in chief did Mr. Oubre offer any

3    witnesses or evidence.  At the close of the case in

4    chief, the Court offered Mr. Oubre a chance to reopen.

5    Mr. Oubre declined the Court's invitation and told the

6    Court he would not.  Lewis Brisbois Bisgaard & Smith and

7    David Oubre" --

8              MR. BITGOOD:  Am I going to fast, ma'am?

9              THE REPORTER:  You're chewing your gum.

10              MR. BITGOOD:  I'm going to get rid of that.

11              THE REPORTER:  Can you take the gum out,

12    please?  I can't understand you when you're chewing your

13    gum.

14        Q.  (BY MR. BITGOOD)  It says, "Lewis Brisbois

15    Bisgaard & Smith California and David Oubre failed to

16    discharge their obligations under Rule 12," which you

17    just testified as a disqualification motion.  Correct?

18        A.  No, I didn't testify to that and that's not a

19    correct statement.

20        Q.  Okay.  "The Court removed Lewis Brisbois

21    Bisgaard & Smith California and David Oubre from this

22    case as mandated by law and struck the pleadings as

23    mandated by law."  You saw that?

24        A.  No, I've never seen it.

25        Q.  Okay.  Take a look at it now.

1    A.  Well, you just read me about six paragraphs.

2  What would you like me to do with that?

3    **Q.  Just take a look at it.  You said you've never**

4  **seen it before.**

5    A.  Okay.  I'm looking at it.  Do you have a

6  question for me?

7    **Q.  Yes.  If you could flip to the next page.**

8    A.  I'm on page 4.

9    **Q.  Did the Court sign this document?**

10    A.  There is a signature here.  I assume it's the

11  ancillary judge.

12    **Q.  Now, Mr. Helfand, when you applied for the TRO,**

13  **you recall that we had a hearing before Judge Ellison on**

14  **October 6th of 2022, don't you?**

15    A.  I don't recall the date, but I do recall a

16  hearing.

17    **Q.  Do you recall telling this Court, in seeking**

18  **that TRO, that your client had Patent No. 3,722,172**

19  **issued to your law firm -- or your client's firm if you**

20  **want to call it that -- under the name Lewis Brisbois**

21  **Bisgaard & Smith?  You remember telling the judge that?**

22    A.  No, I don't remember telling the judge that.

23    **Q.  Not a problem.  And, sir, isn't it true that**

24  **the time you brought the lawsuit and appeared before**

25  **this Court and told this judge that Patent No. 3,722,172**

1    belonged to your client, it did not?

2         A.  Again --

3              MR. FISHER:  Objection.

4         A.  I don't know that I ever said that.  So I don't

5    know.

6         Q.  (BY MR. BITGOOD)  Well, let me ask you this

7    question:  Did Patent No. 3,722,172 belong to your

8    client on the date of October 6th, 2022?

9         A.  I don't have any means of answering that

10   question with what I have before me right now.

11        Q.  Well, here's your transcript --

12        A.  I don't have any memory of it.

13        Q.  Here's the transcript of what you said.  Take a

14   look.

15        A.  Thanks.  Where am I looking at?

16        Q.  Right there where you're --

17        A.  Well, let's --

18        Q.  Don't lose the page, please.

19        A.  I'm not going to lose the page.  You've handed

20   me the transcript of the hearing dated October 6th, 2022

21   and you've directed me to -- oh, it's numbered at the

22   top there.  Sorry.  You've directed me to page 9.  What

23   would you like me to read?

24        Q.  What you told the Court regarding the patent, 3

25   million -- I don't know if it's a patent.  It's

1  **called --**

2      A.  Well, what was the number you were asking me

3  about?  What did it end in?

4      **Q.  The patent number?**

5      A.  Yes.

6      **Q.  3,722,172.**

7      A.  Okay.

8      **Q.  What did you tell the Court?**

9      A.  I told the Court, "Mr. Easton also either

10  falsely or inaccurately represents to the Court that

11  Lewis Brisbois does not have a trademark, but Your Honor

12  has these filed with the complaint.  The firm has

13  trademark No. 3722172, filed on December 8th, 2009" --

14  not 2022, 2009 -- "to use the name and the insignia

15  Lewis Brisbois Bisgaard & Smith, LLP, quote, for legal

16  services, closed quote.

17      **Q.  Now, I'll repeat my question.  On October 6th**

18  **of 2022, when you told this Court to issue a TRO, did**

19  **your client have ownership of Patent No. 3,722,172 as**

20  **you represented to the Court?**

21              **MR. FISHER:**  Objection.

22      A.  You're mischaracterizing what I said then and

23  what I just read now.

24      **Q.  (BY MR. BITGOOD)  Okay.  Well, let me ask**

25  **you --**

1       A.  I didn't say it the way you said it.  I said

2   you have this filed with the complaint is what I said.

3   It was filed with the complaint.

4       **Q.  Okay.  But here's the question.  Did your**

5   **client own Patent No. 3,722,172 on October 6th of 2022?**

6       A.  As we sit here today based upon what I have in

7   front of me, there is no way for me to answer that

8   question.

9       **Q.  So you don't know?**

10      A.  I do not know of my own personal knowledge, no,

11  not as we sit here today.  I have documents in the

12  office I can check.

13      **Q.  How about you look at the patent you attached**

14  **to it?  You attached it to the -- here it is.  Right**

15  **behind it is a certified copy from the United States**

16  **Patent and Trade Office showing you did not own it.  So**

17  **if you want to skip to that page as well.**

18      A.  Okay.  Well, I'm now looking at Document 1-1,

19  Exhibit 1, which showed the service mark registered with

20  the U.S. Patent and Trade Office.  Now you want me to

21  look at a different page?

22      **Q.  No.  You see the number there, 3 million --**

23  **whatever that --**

24      A.  3,722,172 filed on December 8th, 2009.

25      **Q.  Which brings us back to the same question that**

Page 26

```
 1    you told the judge that you owned the patent?
 2         A.  I did not say owned the patent.  That's not in
 3    here.
 4         Q.  Have the patent?
 5         A.  No.  I didn't say have the patent.
 6         Q.  Okay.  Why don't we fast forward and tell
 7    the --
 8         A.  First of all --
 9         Q.  Why don't you tell us --
10              THE REPORTER:  One at a time.
11              THE WITNESS:  My mistake.
12         Q.  (BY MR. BITGOOD)  Why don't you tell us, on
13    October the 6th, 2022, did your client own the patent?
14         A.  I'm going to say it for the third time.  Based
15    on what I have here, I can't tell you -- well, it looks
16    like it based on what you've handed me, Exhibit 1, yes.
17    This is a registered -- December 8th, 2009.
18         Q.  And it's --
19         A.  I'm sorry.  Wait a minute.  I'm sorry.  U.S.
20    patent, no.  My client did not have a patent.
21         Q.  Okay.  Or a trademark?
22         A.  Well, yes, this is a trademark registration.
23    See?  It's a service mark.
24         Q.  Okay.  And it was dated December 8th, 2009?
25         A.  Yes, sir.
```

```
1        Q.   And it expired ten years?

2        A.   It doesn't say on here when it expired.

3   There's no expiration date listed on here.

4        Q.   Go to the next page, sir.

5        A.   Now I'm looking at Document 35-2.

6        Q.   And what is that document, sir?

7        A.   This says, "United States of America.  To all

8   to whom these presents shall come, United States

9   Department of Commerce, United States Patent and

10  Trademark Office.  October 4th, 2022.  The attached U.S.

11  trademark registration 3.722.172 is certified to be a

12  true and correct copy of the registration issued by the

13  United States Patent and Trademark Office and

14  subsequently cancelled.  Registered" --

15            THE COURT:  Not too fast, now.

16       A.   "Registered for a term of ten years from

17  December 8th, 2009.  Section 8 and 15, classes

18  cancelled:  INT class 045.  Said records show title to

19  be in:  Registrant.  By authority of the Under Secretary

20  of Commerce for Intellectual Property and Director of

21  the United States Patent and Trademark Office."  And

22  there's a signature over the name Miguel Tarver,

23  certifying officer.

24       Q.   (BY MR. BITGOOD)  Now, based on those two

25  documents, you still can't tell this Court whether your
```

1    client owned that trademark on October 6th of 2022?

2         A.  I know for sure my firm owned that trademark on

3    October 6th, 2022.

4         Q.  Despite what that patent office says?

5         A.  Yes, because registration with the U.S. Patent

6    and Trademark Office is not required to claim a

7    trademark.

8         Q.  I didn't ask you that.  I asked you what you

9    told the Court and I asked you what that document shows.

10        A.  I told the Court my client had a trademarked

11   name evidenced by, among other things, that trademark

12   registration.

13        Q.  Which expired in 2019.  Correct?

14        A.  The trademark registration did not expire.  It

15   indicates that it was cancelled.

16        Q.  Even better.  Go ahead.

17        A.  But that doesn't change the trademark right.

18        Q.  Mr. Helfand, I'm not asking you for a legal

19   lesson.  I'm just asking what the document says.

20        A.  I've read you the document, Mr. Easton.

21        Q.  Thank you.

22             THE REPORTER:  Is this an exhibit?

23             MR. BITGOOD:  It's going to be right now.

24   That would be Exhibit No. 17.

25             THE REPORTER:  Ms. Norman, are you keeping

1    a record?

2                    MS. NORMAN:  I am.

3                    THE REPORTER:  Thank you.

4        Q.  (BY MR. BITGOOD)  Now, on this complaint where

5    you said we took the name and your client owned the

6    patent and everything else, besides the words Lewis

7    Brisbois Bisgaard & Smith, LLP --

8                    MR. FISHER:  Would you like me to speak?

9                    MR. BITGOOD:  Yeah.

10                   MR. FISHER:  Okay.  It's Lewis Brisbois

11   Bisgaard & Smith.  You keep trying to mock the name of

12   the firm and it's getting offensive.  It's been going on

13   now for at least a year and a half.  Please stop.

14                   MR. BITGOOD:  Are you done?

15                   MR. FISHER:  Yeah.

16                   MR. BITGOOD:  Would you like me to shorten

17   it, LBBS maybe?  That make you happier?

18                   MR. FISHER:  Just please don't mock the

19   name --

20                   MR. BITGOOD:  We're not mocking any --

21                   MR. FISHER:  -- of my law firm.

22                   MR. BITGOOD:  That's the way I speak.

23   That's the way I read.  It may not be your perfect

24   English.

25                   THE COURT:  Let's move on.  The point's

```
 1   been made.  Let's move on.
 2               MR. BITGOOD:  Thank you, sir.
 3       Q.  (BY MR. BITGOOD)  Now, besides those words --
 4   Lewis -- and since it's my firm at the time -- Lewis
 5   Brisbois Bisgaard & Smith, a Texas domestic, is there
 6   anything in that letterhead or anywhere that we took any
 7   of your trademarks, your logos or your patent, just
 8   beyond the four names?
 9       A.  Yes.
10       Q.  Where?
11       A.  In the use of the name.
12       Q.  I said beyond the use of the name.  Anything
13   else besides those names?
14       A.  I don't know.  I'd have go back and do some
15   research.  I mean, I can't point to something as we're
16   sitting here, but there very well may be.  It would be
17   in the motion for summary judgment.
18       Q.  Thank you.  Is it --
19       A.  I think there is actually --
20               THE REPORTER:  I can't hear you.
21       A.  Like, where's the picture that you sent with
22   the --
23       Q.  (BY MR. BITGOOD)  Anything you want to add from
24   that picture?
25       A.  No.  It's repeated again in the picture.
```

Page 31

1        Q.   Okay.

2        A.   The record on appeal 2547 to 2549.

3        Q.   **And this is one where you told the Fifth**

4    **Circuit that I offered legal services to the City of**

5    **Sugar Land?**

6        A.   One, I didn't tell the Fifth Circuit anything.

7    Second, nobody told the Fifth Circuit that you offered

8    legal services to the City of Sugar Land.

9        Q.   **Let me see that exhibit again, sir.  The one we**

10   **used earlier with Mr. Giles.**

11              MR. FISHER:  I'm sorry.  I need a number.

12   You've got a bunch of them.

13              THE WITNESS:  Exhibit 58?

14           MR. BITGOOD:  I think it's 22.

15              THE WITNESS:  22?

16           MR. BITGOOD:  What did we call it?

17              THE WITNESS:  22.

18       Q.   **(BY MR. BITGOOD)  No, the other one you handed**

19   **me.  Nice try though.**

20       A.   I handed you the one you asked for.  Would you

21   like a different one?

22       Q.   **No.  That one will be fine, Bill.  Thank you.**

23   **I'm looking at the first page of Appellee's Brief in**

24   **Appeal No. 23-20065, filed on December 1st, 2023.  The**

25   **top of the brief says William S. Helfand and Sean M.**

Page 32

1    Higgins.  You're William Helfand.  Correct?

2        A.  I am that William Helfand, yeah.

3        Q.  Okay.  And on page 5 you make the following

4    statement to the Fifth Circuit:  "Defendants' misuse of

5    LBBS's mark has created confusion.  For example, Bitgood

6    sent an e-mail to the city attorney for Sugar Land,

7    Texas offering mediation services through his infringing

8    entity.  Record on appeal 2550.  The city attorney

9    forwarded the e-mail to an LBBS partner.  Record on

10   appeal 2550.  Mr. Helfand spoke with the city attorney

11   and explained how defendants, quote, 'were improperly

12   using the name of the law firm Lewis Brisbois

13   Bisgaard & Smith.'  The city attorney 'understood that

14   there was some effort on Bitgood's part, Ms. Norman's

15   part with Mr. Beers' assistance to create confusion

16   regarding who was the firm of Lewis Brisbois

17   Bisgaard & Smith.'  Record on appeal 2346.  Record on

18   appeal 19.  Record on appeal 145923."  Now, where was

19   it, based on your brief, that I offered legal services

20   to the City of Sugar Land, Texas?

21       A.  I have never said you offered legal services to

22   the City of Sugar Land, Texas.  Second time I've said it

23   now, Mr. Easton.  I've never said that and you won't

24   show me anywhere that I did.

25       Q.  Okay.  "For example, Bitgood sent an e-mail to

 1    the city attorney of Sugar Land, Texas offering

 2    mediation services."  Where did I do that?

 3         A.  Right here.  It's in Exhibit -- the second page

 4    of Exhibit 8.

 5         Q.  Could you show -- or tell the Court where

 6    exactly I offered mediation services to --

 7         A.  It's in the heading, sir.

 8         Q.  Oh, so you're saying the letterhead is an

 9    offer?

10         A.  Yes.  The letterhead specifically identifies

11    that you are using the name of Lewis Brisbois

12    Bisgaard & Smith to provide arbitration and -- excuse

13    me -- mediation and arbitration.

14         Q.  Where in this document -- it's a chronology of

15    the document filed in state court -- does it say I'm

16    offering mediation services to your client?

17              MR. FISHER:  Asked and answered.

18         A.  First of all, I don't agree with your -- I

19    don't agree with your sidebar characterization of what

20    the document is.  Second of all, I'll say the same thing

21    again.  In the very beginning of the document it offers

22    mediation and arbitration services in the name of my law

23    firm.

24         Q.  (BY MR. BITGOOD)  Where does it say I'm

25    offering it directly to the City of Sugar Land as it's

1   stated in the brief?

2        A.   Where does it say in my brief "directly"?

3        Q.   "For example, Bitgood sent an e-mail to the

4   city attorney for Sugar Land, Texas offering mediation

5   services."  Where am I making an offer to your client?

6        A.   Third time now, Mr. Bitgood --

7             MR. FISHER:  Objection.

8        A.   -- right here, at the very top here.  You asked

9   me about directly, but that's not in the pleading.

10  There is no directly, that's something you added.  It's

11  right here, third time.

12       Q.   (BY MR. BITGOOD)  So your position is by using

13  the letterhead that was an offer to offer mediation

14  services to a third party?

15       A.   Yes.

16       Q.   So when Jana Lupert writes me a letter

17  threatening me, is she offering me legal services too?

18       A.   I don't know if Jana Lupert has written you a

19  letter.  I don't know the contents of the letter, and I

20  don't know Ms. Lupert's intent.  So I can't answer that

21  question.

22       Q.   So when you write a letter on a letterhead, as

23  I wrote to the judge on this very letterhead, am I

24  offering the judge mediation services?

25       A.   You may very well be and he may very well

Page 35

```
 1   interpret it as such.
 2              MR. BITGOOD:  What was the state court
 3   pleading?
 4              MS. NORMAN:  Huh?
 5              MR. BITGOOD:  I mean the federal petition.
 6        Q.  (BY MR. BITGOOD)  Mr. Helfand, on the exhibit
 7   you previously identified as the original petition in
 8   this case, Defendants' Exhibit 17, you state in
 9   paragraph 28 -- or your client on your behalf states,
10   "In an effort to avoid the necessity of the suit, Lewis
11   Brisbois requested" -- did I say it correctly?  Lewis
12   Brisbois?
13              MR. FISHER:  Thank you.
14        Q.  (BY MR. BITGOOD)  "Desist in their fraudulent
15   and infringing conduct.  Defendants refused to do so and
16   on September 23rd, Bitgood sent an e-mail with the
17   subject line not affiliated with Lewis & Bobo, a
18   California foreign LLP to Lewis Brisbois."  Withdraw the
19   question.
20              Mr. Helfand, besides the state court
21   filings that you've identified to this Court, besides
22   the filings in state court, do you have any evidence
23   that there's been any commercial use where we have done
24   business as Lewis Brisbois?
25        A.  Yes.
```

Page 36

1     **Q.   Would you please state what that evidence is?**

2     A.   It's those things attached to the motion for

3     summary judgment.

4     **Q.   I'm asking you now.**

5     A.   I don't have a specific -- well, I have some

6     recollection but it's not an exhaustive list.

7     **Q.   Well, just give us one.**

8     A.   Well, you've repeatedly reported to Law360 that

9     you're the owner and rightful user of my firm's

10    trademark.

11    **Q.   And you're claiming that's commercial use?**

12    A.   That is a commercial use, yes.

13    **Q.   And you wrote the article for Law360?**

14    A.   What would make you think that?

15    **Q.   I'm asking you since you're testifying to what**

16    **somebody else told you.**

17    A.   No.   I'm testifying to what you were quoted as

18    saying in the article, Mr. Easton.

19    **Q.   And you know I was quoted how?**

20    A.   I read the quote in the article.

21    **Q.   And you know that's accurate how?**

22    A.   Because you've not asked for a retraction or

23    otherwise told the Court that there was anything

24    inaccurate about it the last time I pointed it out to

25    the Court that you continue to usurp and defame my

Page  37

```
 1    client's trademark.
 2         Q.  And that's the day of the temporary injunction
 3    which brings us to December 15th.  Correct?
 4         A.  I don't know what question you're asking.
 5         Q.  I said when you say you pointed out to the
 6    Court that I was usurping your client's name one of the
 7    issues you raised was that I talked to Law360?
 8         A.  No, that is not an issue I raised.
 9         Q.  Okay.  So you don't recall the -- when I asked
10    the Court, you're not going to issue an injunction to
11    prevent me from talking to the media and this Court said
12    no, I'm not?
13         A.  Right.  No one asked the Court to do that.
14         Q.  You claim that I violated the TRO, did you not?
15         A.  You did violate the TRO.
16         Q.  Where did I violate the TRO?
17         A.  By repeatedly broadcasting that you had a legal
18    right to use a trademarked name despite the fact that
19    you were already aware and you admitted that you would
20    not -- you agreed that you would not continue to use
21    that name.
22         Q.  And on that day we pointed out to you, okay,
23    that we had told you that we had already stopped October
24    6th was prior to that date.  Correct?
25         A.  No.
```

Page 38

```
 1        Q.  On October 6th we filed with this Court a
 2   dissolution.  Do you remember receiving that?
 3               MR. FISHER:  Objection.
 4        A.  You've asked two questions.  The answer to the
 5   first question is, no, you didn't do it on October 6th
 6   and, yes, I did eventually receive a copy of that.
 7        Q.  (BY MR. BITGOOD)  And it's filed stamped in
 8   this court case as October 6th, 2022, at Docket 13.
 9   Correct?
10        A.  No.  It's stamped on October 11th.  It's in the
11   record on October 11th.
12               MR. BITGOOD:  Where's the docket sheet?
13               MS. NORMAN:  Where is it?
14               MR. BITGOOD:  It's one of our exhibits.
15               THE REPORTER:  Do you have that one,
16   Ms. Norman?
17               MS. NORMAN:  Uh-huh.
18               MR. BITGOOD:  I think you stapled the pages
19   backwards.  Yeah.
20        Q.  (BY MR. BITGOOD)  The docket shows 10/6/2022,
21   Docket No. 16.  It says, "Letter and notice of agreement
22   winding up and terminating limited partnership."  It was
23   a letter to His Honor with the paperwork -- I'm going to
24   hand you what's been marked as Exhibit 23A.  Would you
25   read the date across the top of 23A?
```

Page 39

```
 1        A.  Oh, the file stamp?
 2        Q.  What it says across the top.  When did the
 3   clerk file it?
 4        A.  10/6/2022.
 5        Q.  Okay.  That's my letter to the Court telling
 6   the Court we quit.  We dissolved.  We're done.  Correct?
 7        A.  I don't agree that that's -- those words are
 8   aren't in here.
 9        Q.  Okay.  Let me have the letter, please.
10        A.  I don't see we quit.  I don't see --
11        Q.  Here's what the letter says, Mr. Helfand.  Dear
12   Judge Ellison, I enclosed the paperwork filed on even
13   date with the Texas Secretary of State which resolves
14   the grievances as set forth by plaintiff pro se.  We do
15   this because it is obvious from the Court's gentle
16   reasoning and thoughts as expressed by His Honor on the
17   record that this is the right thing to do.  If plaintiff
18   pro se wants to continue this fight, then we cannot
19   control that.  However, not one of your words spoken
20   today was lost on me, and as such, we yield to you out
21   of respect, not of fear of the plaintiff.  Thank you
22   again for the way you handled the matter.  It's dated
23   October 6th, 2022, and the dissolution papers are also
24   dated October 6th, 2022.
25        A.  Do you have a question for me, sir?
```

1      Q.   Yeah.  I'm looking -- hang on.  I just want to

2  make sure when you said it was dated October 11th.

3      A.   Sure.  Can I see the docket sheet that you're

4  looking at there?  I'll explain it.

5      Q.   I don't need you to explain it.  I asked you

6  what it reads across the top.  What does it --

7      A.   Well, I've already read -- I told you what it

8  reads across the top, but if the docket sheet shows it

9  was filed on October 11th.  We had this conversation at

10  the temporary junction hearing, Mr. Easton.

11           MR. BITGOOD:  Objection, nonresponsive.

12      A.   Can I see the docket sheet?

13      Q.   (BY MR. BITGOOD)  No.

14      A.   Okay.

15      Q.   So consider --

16           THE COURT:  Let's make available the

17  document.

18      Q.   (BY MR. BITGOOD)  Yes, sir.

19      A.   Thank you.  May I see it, please?

20      Q.   Yes.

21      A.   The entry on the docket sheet says, quote,

22  "Letter and notice of agreement winding up and

23  terminating limited partnership by Michael Joseph

24  Bitgood, filed.  Entered 10/11/2022.  That's when I

25  would have received it, Mr. Bitgood.

Page 41

1      Q.   Okay.  So you did receive it the night we

2  clicked and sent it to you.  Correct?

3      A.   I don't have any -- you don't have any proof

4  you clicked and sent it to me.  I did not receive

5  anything of that sort until October 11th, 2022, as the

6  clerk notes in the ECF and as we discussed at the

7  temporary injunction hearing when you asked me about

8  this beginning of page 67.

9      Q.   What did you say then?

10      A.   I told you the same thing.  Docket entry 16 has

11  a date on it of October 6th, 2022, but it says, "Letter

12  and notice of agreement winding up and terminating

13  limited partnership by Michael Joseph Bitgood.  Entered

14  October 11th, 2022."

15      Q.   But the top of the page shows received by the

16  clerk on 10/6.  Correct?

17      A.   No, it does not say received by the clerk on

18  the top of the page.

19      Q.   Well, do you know any other way for that to get

20  on the top of the page?  It says case number, document

21  number, filed on, the word "filed on" is across.

22      A.   Let me see the document again.

23      Q.   Right here.  We'll call it again Exhibit 23A.

24  Cause No. 4:22-CV-03279, Document 16, filed on

25  10/6/2022.

1      A.   Okay.  If you're going to show me the document,

2   you don't have to read to me.  I'm capable of reading

3   it.

4            MR. BITGOOD:  Objection, nonresponsive.

5      A.   So your question was how did that get on there?

6      Q.   (BY MR. BITGOOD)  I'm not asking how it gets on

7   it.  Is that what it demonstrates as filed on?  That's

8   what the clerk put there.

9      A.   The clerk puts that date on it.

10     Q.   Okay.  Thank you.

11     A.   And I know why.  Would you like to know why?

12     Q.   Mr. Helfand, no.

13     A.   Okay.  That's okay.

14     Q.   I want to talk a little about your billing.

15  Okay?

16     A.   Whatever questions you have.

17     Q.   And to be clear, you didn't bring this

18  so-called Lanham Act case in retaliation for what was

19  going on in state court.  Is that correct?

20     A.   Of course not.

21     Q.   Of course not.  And of course you made your

22  objections in state court to what was going on in state

23  court.  Correct?

24     A.   I've never appeared --

25            THE WITNESS:  Objection.  Who's you?

1      A.   I've never appeared in the state --

2           MR. BITGOOD:  Your client, Lewis Brisbois.

3  Please make that clear.

4      A.   I have no --

5           THE REPORTER:  One at a time.

6      Q.   (BY MR. BITGOOD)  You're going to be your own

7  lawyer now?

8      A.   No.

9           THE COURT:  Let's stop this back and forth.

10  Mr. Helfand, do you have an answer or did you answer

11  already?

12      A.   I have no personal knowledge of anything that

13  happened in the state court proceeding.

14           THE COURT:  Okay.  Let's move on.  Let's

15  move on.

16      Q.   (BY MR. BITGOOD)  But you didn't bring this

17  action as a retaliation for what was going on in state

18  court, you said no.

19      A.   He would probably say asked and answered.  I'll

20  tell you again, no.

21      Q.   You began researching to sue us on September

22  7th of 2022.  According to your billing, that would be

23  LBBS page 1.

24      A.   I did not.

25      Q.   Well, who did?

1        A.   A gentleman named Sean Braun.

2        Q.   Okay.  So that's what Mr. Braun did?

3        A.   I don't know what you mean.

4        Q.   Is that work that Mr. Braun, Sean Braun --

5        A.   What is that work?

6        Q.   Well, you're billing $350 for legal research

7   but you won't tell us what the research is.  It's

8   blacked out.

9        A.   Right, because that's work product.

10       Q.   But you're seeking affirmative relief.

11  Correct?

12       A.   I don't know what you mean.

13       Q.   Well, you come to court, you're seeking

14  affirmative relief.  You want a permanent injunction.

15  You want attorney's fees and you want damages.

16       A.   Right.

17       Q.   Correct?

18       A.   Right.

19       Q.   Okay.  But you're invoking that as work product

20  but you want to be paid for it at the same time.

21  Correct?

22       A.   Right.

23       Q.   Do you know what he was researching?

24       A.   I don't have a recollection of what he was

25  researching at that time.  It would be something related

Page 45

 1    to bringing this lawsuit.

 2         Q.  On 9/8, additional research is done.  You see

 3    it?  SOB, that's what it means, Sean O. Braun?

 4         A.  That's right.

 5         Q.  9/15, continue preparing complaint against

 6    Bitgood, legal research, outline and then more blanks.

 7         A.  Yes, sir.  I read all that.

 8         Q.  On 9/20, prepare special appearance and appeal

 9    of associate judge's decision dated December 13th, 2022.

10    Let's talk about that for a moment.  You're billing me

11    for something that took place in a case that you claim

12    is totally irrelevant to what's going on here.  Is that

13    correct?

14         A.  There's about three things wrong in that

15    suggestion.  One, it's not totally irrelevant because

16    it's one more place where you misused a trademark that

17    belonged to someone else with the intent to cause

18    confusion.  Two, no one is billing you.  And, three, if

19    what you're asking is whether this is an appropriate

20    billing entry for the Lanham Act case, the answer is no.

21         Q.  Okay.

22         A.  And in the final bill, this would not be on the

23    bill.

24         Q.  Thank you, sir.  9/21, further review filings

25    in underlying lawsuit, revised outline of federal

 1   complaint, and prepare federal complaint against Michael

 2   Bitgood.  That's dated 9/21.  What is the underlying

 3   lawsuit you're talking about there?

 4       A.  I'm not talking about anything because it's not

 5   my entry.

 6       Q.  Okay.  So you're not prepared to testify about

 7   that entry, nor was it reasonable to do or is it

 8   necessary to do because you don't know?

 9       A.  No, that's not the same thing.

10       Q.  I know that.  So I'll ask it a different way.

11       A.  Okay.

12       Q.  It's not your entry, so you can't tell us what

13   happened?

14              THE COURT:  Let him answer the question.

15       A.  I can answer --

16              MR. BITGOOD:  I withdrew the question, Your

17   Honor.  So I withdrew it --

18              THE COURT:  Yeah.  I heard you ask another

19   question.

20              MR. BITGOOD:  Okay, sir.

21       A.  I can tell you what was going on.  I can't tell

22   you the specific answers to specific questions like what

23   is the underlying lawsuit.  Actually, I think I know

24   what the underlying lawsuit is, but your question to me

25   was you were doing work related to the underlying

Page  47

1    lawsuit and I said no, I wasn't.

2        Q.  (BY MR. BITGOOD)   Okay.   Further review filings

3    in underlying lawsuit.   Could you explain to us what

4    that --

5                MR. FISHER:   Can you put that on --

6        A.   I expect that that was Mr. Braun's work similar

7    to his entry from the prior day.

8        Q.  (BY MR. BITGOOD)   Well, let's not do similar to

9    the prior day.   Let's stick with that.

10       A.   Let me answer the question.

11               THE COURT:   Let him complete his answer.

12       Q.  (BY MR. BITGOOD)   Okay, sir.

13       A.   I believe that's Mr. Braun's work --

14       Q.   Thank you, sir.

15       A.   -- similar to the work that he was doing on

16   September 20th related to the associate judge's

17   decision.

18       Q.   Okay.

19       A.   That first phrase.   Now, the rest of it

20   obviously is related to this lawsuit.   On the final

21   bill, I would take that all off because I can't parse

22   that.

23       Q.   Additional research, 9/22, continue preparing

24   federal complaint against Bitgood and his counsel.   You

25   see that one there?

```
 1        A.   Yes, sir.
 2        Q.   9/23, prepare and file draft of federal
 3   complaint against Bitgood and other defendants.  Now,
 4   the day you filed suit, the day LBBS -- so there's no
 5   more confusion -- your client LBBS filed suit was
 6   September the 23rd.  Correct?
 7        A.   I don't know, but it appears to be the case.
 8        Q.   Okay.  September 27th, additional research and
 9   document review for federal lawsuit against Bitgood.
10        A.   Right.
11        Q.   9/28, additional research, but we don't know
12   what he was doing.  It doesn't say what case he was
13   working on, does it?
14        A.   Well, no.  It does say he was working on this
15   case.
16        Q.   It says research pertaining blank and update
17   legal research regarding same.  It doesn't tell us what
18   case he's working on.
19        A.   It does tell us what case he's working on
20   because he had to identify this case as the case he was
21   working on before he made the entry.
22        Q.   Just like he did the other three entries that
23   you claim you parse.  That one was pretty clear and
24   specific.
25        A.   First of all, there weren't three entries.
```

```
 1   Second -- it would have been only one.  Second of all,
 2   he billed to the wrong file.
 3        Q.  Okay.
 4        A.  So I can see why -- I can see his confusion,
 5   but he billed to the wrong file.  I can tell from two
 6   entries that he billed to the wrong file.
 7        Q.  Okay.
 8             THE COURT:  Let's take a two-minute break.
 9             (Recess 2:37 p.m. to 2:51 p.m.)
10        Q.  (BY MR. BITGOOD)  Okay.  Going on to LBBS 1.
11        A.  Okay.  Page 1 of Exhibit 57?
12        Q.  Yes.
13        A.  Okay.  Yes, sir.
14        Q.  LBBS 1.
15             MR. BITGOOD:  Your Honor, the reason I'm
16   slow is because the surgery didn't come out right.  So I
17   can't even have the dexterity to flip the pages.
18             THE COURT:  The what?
19             MR. BITGOOD:  The dexterity of hands.
20             THE COURT:  I'm sorry.  I'm sorry.  We'll
21   wait.  We'll wait.
22             MR. BITGOOD:  That's why it's taking me
23   longer to flip pages than I used to.
24        Q.  (BY MR. BITGOOD)  There is an entry on page
25   LBBS 2.  It says 10/4/22 SOB, that would Sean Braun
```

Page 50

1    again?

2        A.  Yes, sir.

3        Q.  **Prepare appeal of associate judge's decision on**

4    **Bitgood's request of finding of facts and conclusions of**

5    **law.  That doesn't belong here, does it?**

6        A.  When we reduce this to a final bill, I would

7    remove that.

8        Q.  **Okay.  Review cases sent by Sean Braun and take**

9    **notes of same.  You don't know what case he's talking**

10   **about, do you?**

11       A.  One second.

12       Q.  **Can I have the benefit of the doubt by saying**

13   **it's not clear enough?**

14       A.  I know that there are cases related to this

15   matter.

16       Q.  **Then 10/6, right before the hearing, who's AB?**

17       A.  AB, that is Audrey Bridges.

18       Q.  **Okay.  Assistance with criminal background**

19   **checks, summary, and preparation for injunction hearing.**

20   **Did a criminal background check.  Correct?**

21       A.  Ms. Bridges did.

22       Q.  **Okay.  10/6, prepare exhibit list and exhibits**

23   **and finalize for today's hearing.  See that one?  CR?**

24   **Who's CR?**

25       A.  CR is Candace Russell.

```
 1        Q.  Okay.  This one doesn't have anything.  It
 2   has -- the next entry 10/6, analyze case law
 3   regarding -- and again blacked out -- and created
 4   outline based on that analysis.
 5        A.  Yes, sir.  That blacked out -- there's a
 6   portion that's blacked out.
 7        Q.  Who's J -- does that JDJ mean the person who
 8   worked on it?
 9        A.  That's the initials of the associate who worked
10   on it.
11        Q.  Who is JDJ?
12        A.  Jatoriyae Dupree Jones.  And Jatoriyae is
13   J-A-T-O-R-I-Y-A-E, Dupree, D-U-P-R-E-E, Jones.
14        Q.  10/6, draft elements of TRO and proposed
15   settlement issues.
16        A.  What number?
17        Q.  That's at the bottom of the page, Mr. Helfand.
18   I apologize.  The WSH, that's you.
19        A.  No.  The thing you just read -- are you ready
20   for this?  The thing you just read was BF4.
21        Q.  Oh, and then what's WSH?  What did you do
22   there, WSH?
23        A.  Additional review and preparation for hearing,
24   preparation of exhibits for hearing, telephone
25   conferences with several witnesses regarding testimony,
```

1    preparation of cross-examination outline for examination

2    of three defendants, prepare for and attend hearing,

3    office conference with Shane Kotlarsky regarding form of

4    temporary restraining order, correspondence to Jana

5    Lupert, receipt and review and respond to numerous

6    e-mails from pro se defendant.

7         Q.   That's that particular entry.  Okay.  Now let's

8    go to -- on page 3 there is one, two, three, four all

9    blacked out that say phone call with State Bar of Texas

10   regarding blank.  What does that have to do with this

11   case?

12        A.   Only one of them says that.

13        Q.   I'm sorry.  You're correct.  Let me go back.

14   Phone call with blank regarding -- and it doesn't tell

15   us what was done.

16        A.   That's correct.

17        Q.   Who's AR?

18        A.   AR is -- oh, here it is, Antonio Ramirez.

19        Q.   Okay.  And you can't tell us what that research

20   was on or the second entry that says, "AR researching

21   law on blank"?

22        A.   I can tell you, but not based on this document.

23        Q.   Okay.  Next entry, phone call with blank

24   regarding blank.  Can you tell us what that had to do

25   with this case?

```
 1        A.   Well, I can tell you if I see the unredacted
 2   version, but I can't tell you based on the redacted
 3   version.
 4        Q.   Fair enough.  Next, phone call with State Bar
 5   regarding blank.  Can you tell us what that had to do
 6   with this case?
 7        A.   Again, I could tell you if I have the
 8   unredacted version.
 9        Q.   So AR is the person I'm going to have to depose
10   to get these answers, Bill?
11        A.   I don't know that deposing Mr. Ramirez will do
12   you any good because the information that's blacked out
13   is privileged.  He wouldn't be able to testify to it
14   whether he could read it or even if he remembered it.
15        Q.   Researching disciplinary history for blank.
16   How is that connected to this case?
17        A.   Well, my expectation is that I assigned
18   Mr. Ramirez to research the disciplinary history for the
19   two lawyers who are defendants in this case.
20        Q.   And that was to do what, to impeach them, sling
21   mud?  What were you going to do with that information?
22        A.   Well, what I would do with that information
23   would be work product.
24        Q.   Okay.  But you want to get paid for it?
25        A.   Your statement is not correct, sir.  You --
```

```
 1           Q.  Is it --

 2           A.  You --

 3           Q.  Is it --

 4           A.  You required a lawsuit to resolve this problem.

 5      You expanded the lawsuit in our efforts to resolve this

 6      problem.  So we've handled this like every problem we

 7      handle for a client.  And under the statute, the law

 8      firm is entitled to recover its attorney's fees.

 9           Q.  Are you done with -- that was the answer?

10           A.  That's my answer.

11           Q.  Okay.  Thank you.  10/6, draft proposed TRO as

12      requested by the Court, SOK.  Who did that?

13           A.  That's Shane L. Kotlarsky, K-O-T-L-A-R-S-K-Y.

14           Q.  Okay.  10/12/22, that would be on 4.  I

15      apologize again, Bill.

16           A.  I found it.

17           Q.  There is an entry, e-mails with defendant

18      Richard Jones regarding LBBS' settlement demands, 1.40,

19      $350.  When did you visit with Mr. Jones at all?

20           A.  I did not visit with Mr. Jones.

21           Q.  Has anybody at your firm that you know of

22      talked to Mr. Jones?

23           A.  I don't know whether anyone has talked to

24      Mr. Jones.

25           Q.  And you would agree Mr. Jones was a named
```

1    defendant who has not been served after 18 months in

2    this case.  Is that correct?

3         A.  I agree Mr. Jones is a named defendant.  I

4    don't know whether Mr. Jones has been served or if he

5    hasn't been served, how long it's been since he hasn't

6    been served.

7         Q.  Would it surprise you to know he's never been

8    served?

9         A.  I don't know whether it would surprise me or

10   not.

11        Q.  Do you know if no summons was issued for him?

12        A.  I do not know that that is the case.

13        Q.  Do you that no summons was issued for any

14   defendant in this case?

15        A.  I do not know whether that's the case.

16        Q.  10/28/22.

17        A.  What page are you on?

18        Q.  It would be LBBS 6.

19        A.  6?

20        Q.  That would be the third entry.  Receipt and

21   review indictment and information regarding Bitgood's

22   arrest for felony stalking in Fort Bend County.  What

23   does that have to do with this case?

24        A.  Well, the use to which we put that information

25   is work product.

Page 56

1      Q.  So if it's work product, why is it uncovered?

2  Everything else that's covered that you blacked out, you

3  claimed as work product.  This one is glaring there in

4  black and white.

5      A.  No, I think you misunderstood.

6      Q.  Okay.

7      A.  Sometimes we list in the billing entry

8  something that would reveal our work product.  That, we

9  have redacted.  This entry, it simply lists what

10  somebody did.  Your question was what would you do with

11  that information.  What I would do as counsel for the

12  plaintiff with that information is work product.  I

13  can't answer that question.

14      Q.  What was the purpose of obtaining the

15  information?

16      A.  That would be work product.

17      Q.  Can you explain why you were able to get it on

18  10/28/22 and the defendant couldn't get it till November

19  14th?  How did you get it?  It's work product too?

20      A.  First, I don't know what you're talking about.

21      Q.  I'm talking about the review of the indictment.

22  The date is 10/28/22.

23      A.  I understand.  But you just gave me a bunch of

24  statements that I don't find anywhere in the record.

25      Q.  Let me ask you this question:  According to

Page 57

1    your billing, you received it on 10/28/22.

2         A.  No.

3         Q.  10/28/22, receipt and review indictment and

4    information regarding Bitgood's arrest for stalking in

5    Fort Bend County.

6                   THE COURT:  You're going too fast.

7                   MR. BITGOOD:  Sorry, Your Honor.

8         Q.  (BY MR. BITGOOD)   Receipt and review of

9    indictment and information regarding Bitgood's arrest

10   for felony stalking in Fort Bend County dated 10/28/22.

11   Do you see that entry?

12        A.  I see that entry.

13        Q.  Could you possibly explain how Mr. Braun could

14   get a copy of an indictment that the defendant couldn't

15   get till November?

16        A.  I don't know whether the defendant got it in

17   November or not.  That's just something that's not here

18   anywhere in the record.

19        Q.  Okay.  So the answer to that is no, you cannot

20   explain that?

21        A.  I don't need to explain it because you haven't

22   established the predicate of the question.  I don't even

23   accept the representation.

24        Q.  But you do agree that there was an indictment

25   brought against me for two counts of stalking against

Page 58

1   your purported client?

2       A.   I have no personal knowledge one way or the

3   other.

4       Q.   And you have no knowledge of a writ of habeas

5   corpus releasing me from those charges that were granted

6   on 33 separate grounds?

7       A.   Mr. Easton, I know nothing about that except

8   what I'm reading right here on the entry to which you

9   referred me.

10      Q.   And you had no hand in getting me indicted?

11  That's a fair question.

12      A.   No, I don't think so.

13      Q.   Well, did you or didn't you?  You don't have to

14  think on that.

15      A.   Well, I'm saying I don't know --

16      Q.   If I pick the phone -- let me give you an

17  example, Bill.  I pick up the phone and I call somebody

18  in the prosecutor's office and I say, I don't like Bill

19  Helfand.  If you indict him, you'll be doing me a big

20  favor.  And then I put down the phone and Bill Helfand

21  shows up indicted.  Would you think that my suggestion

22  helped that prosecutor move along?

23      A.   I don't know.  I can't imagine that any

24  prosecutor would indict somebody because you asked him

25  to or someone else asked him to.  But if the question is

Page 59

1    did I make a phone call like that, unequivocally no.

2         Q.  Did anyone in your law firm make a phone call

3    like that?

4         A.  I have no reason to believe anyone did.

5         Q.  Do you know?

6         A.  I don't know that anyone did or anyone didn't.

7         Q.  Have you talked to this so-called prosecutor

8    that brought this indictment?

9         A.  I don't even know who the prosecutor is, let

10   alone have not -- and never spoken to them.

11        Q.  There is on 7, LBBS 7, telephone conference

12   with opposing counsel and forensic examiner regarding

13   protocol.  What's that about?

14        A.  What's the date?

15        Q.  11/16/22.

16        A.  I don't know.  I can't tell from the entry.

17        Q.  Okay.  There's another one, next, that would be

18   page 8.

19        A.  Yes, sir.

20        Q.  11/21/22, teleconference with Wallace Dunwoody

21   in an effort to settle Tim Beers out of case with agreed

22   permanent injunction.  Mr. Dunwoody rejects offer on

23   behalf of Beers.  Do you see that?

24        A.  I see that entry.

25        Q.  Who is BF, Bennett Fisher?

1       A.   Mr. Fisher.

2       Q.   Okay.  The next entry, review objection to de

3  novo hearing in county court at law -- and here's that

4  case again that you say has no relevance to this one --

5  review transcript of November 17th hearing in federal

6  court and review and revise our responses to Bitgood's

7  objections.  Okay.  County court at law case, that's the

8  one in Fort Bend County?

9       A.   Let me stop you for a second because the

10  predicate you've stated is incorrect.  I have not said

11  it has nothing to do with this lawsuit.  I told you it

12  was not the motivation for this lawsuit.  But your

13  conduct and usurping my client's trademark in that

14  lawsuit is evidence in this lawsuit.

15      Q.   Are we talking about the same lawsuit in your

16  entry?

17      A.   It's not my entry.

18      Q.   Whoever -- BF.

19      A.   You'll have to ask Mr. Fisher.

20      Q.   Who is CR?

21      A.   What was the initials?

22      Q.   CR, page 9.

23      A.   I think that's Candace -- well, let me just

24  check.  That is Candace Russell.

25      Q.   Okay.  There's an entry here, review Harris

Page 61

1    County and Fort Bend County websites to determine

2    whether there's a probate action for the Peter Riga

3    estate and print the docket for BGF.  What did that have

4    to do in connection with this lawsuit?  Peter Riga has

5    been dead since 2018.

6         A.  From the entry?  Oh, that's right.  Because you

7    listed Mr. Riga on your letterhead for arbitration and

8    mediation services.

9         Q.  Did I?

10        A.  I believe so.

11        Q.  Okay.

12        A.  Somewhere in your letterhead --

13        Q.  Find it for me.

14        A.  Somewhere in your letterhead I think you had

15   Mr. Riga listed.

16        Q.  Go ahead.

17        A.  So how would I find that for you?  I --

18        Q.  We're going to get you the document --

19             THE COURT:  One at a time.

20             MR. BITGOOD:  Sorry, Your Honor.

21             THE COURT:  One at a time.

22             MR. BITGOOD:  No, no, no, Sue.  The letter

23   to Judge Ellison winding down.

24             THE WITNESS:  How about I see all of them?

25             MS. NORMAN:  Well, this is the --

```
 1              MR. BITGOOD:  That's the narrative reading.
 2              THE REPORTER:  One at a time.
 3              MS. NORMAN:  This is the apparently
 4      offensive letterhead.
 5              THE WITNESS:  Let's not testify,
 6      Ms. Norman.  This is just but one of the offensive
 7      letterheads.
 8         A.  Here's the thing, that's my recollection.
 9         Q.  (BY MR. BITGOOD)  Hold up.
10         A.  Just listen.  That's my recollection.  If
11      you're going to cherry pick documents to show me, that
12      doesn't mean that it doesn't exist, but I'm happy to
13      have that tete-a-tete with you but that won't be proof
14      that it doesn't exist.
15         Q.  So without proof that something doesn't
16      exist --
17              MR. BITGOOD:  Hand it to him.
18         A.  Oh, yes, here it is.  It's Exhibit 23A.  You
19      listed Mr. Riga and yourself as providing mediation and
20      arbitration services.
21         Q.  (BY MR. BITGOOD)  It says Peter J. Riga at the
22      top.  You see it?
23         A.  I don't see anything, sir.  You took it away
24      from me.
25         Q.  Okay.  Exhibit No. 23A.  Could you read the top
```

1  where it says Peter J. Riga and the next line right

2  below his name?

3       A.   Peter J. Riga, Ph.D., JSD, JD, LL, M, ST, D,

4  TH, D, PH, L, Emeritus 2003.  October 29th, 1933, March

5  29th, 2018.

6       Q.   Stop right there, please.  So you know that

7  Mr. Riga is a dead man.  Correct?  He's deceased.

8       A.   I don't know that.

9       Q.   Well, why is your law firm looking up a probate

10  action for him?  And, more importantly, what does he

11  have to do with this case?

12              MR. FISHER:  One question at a time.

13              MR. BITGOOD:  Sorry.  You're right.  I

14  withdraw.

15       Q.   (BY MR. BITGOOD)  Let's go back to the

16  beginning.  At least the letterhead identifies him as

17  deceased?

18       A.   No, it does not.  No, it does not.  It lists

19  two dates.  It doesn't say deceased anywhere on here.

20  And I wouldn't even imagine for a second that somebody

21  who wasn't trying to deceive others would use somebody's

22  letterhead if they were deceased, but I don't see

23  deceased on here in answer to your question.

24       Q.   When you see a letterhead or you see an

25  obituary and it says 1930 -- can I have the document,

 1    please -- 2018, what do you think those numbers would

 2    represent to a normal person?  Now, that may be

 3    difficult for you, but a normal person.

 4                    MR. FISHER:  Objection.  Please define

 5    normal.

 6                    MR. BITGOOD:  Definitely not him.

 7         A.   Okay.  You asked when I see a letter and when I

 8    see an obituary.  I don't know what it means in a

 9    letter.  In an obituary I would assume it's the person's

10    date of birth and date of death.

11         Q.   (BY MR. BITGOOD)  Okay.  And the only person

12    holding himself out as a mediator and an international

13    domestic arbitrator is myself.  Do you see it there,

14    footnote 1?  I'm right below Professor Riga.

15         A.   No, it doesn't say that.

16         Q.   What's footnote 1 say?

17         A.   Footnote 1 says A.A. White Dispute Resolution

18    Institute, University of Houston School of Law.

19         Q.   And what --

20         A.   But --

21         Q.   Go ahead.  I'm sorry.

22         A.   But the answer to your question is

23    mediator/international and domestic arbitrator is under

24    both of your names.

25         Q.   It's not, but that's okay.  Next entry, CR

1    dated 12/7/22.

2         A.  That's on page 9?

3         Q.  Yes.  Search probate records for Peter Riga

4    estate using Texas Courts Google search for his

5    obituary.  See that there?  What does that have to do

6    with this case?

7         A.  Well, again, you sent a number of letters using

8    Mr. Riga's name on the letterhead.  And I can't recall

9    as we sit here whether that also used the Lewis Brisbois

10   Bisgaard & Smith trademarked name.  Clearly, one of

11   us -- it may have been me, it may have been Mr. Fisher,

12   it may have been Mr. Kotlarsky or may have been another

13   lawyer -- asked Ms. Russell to determine whether

14   Mr. Riga was a living, practicing attorney.

15        Q.  12/16/22, page 11.

16        A.  Yes, sir.

17        Q.  Meeting with David Oubre re preliminary

18   injunction, three hours.  Review discovery responses

19   from Beers.  Draft letter to Dunwoody, etc.  What did

20   you and Mr. Oubre talk about in those three hours?

21        A.  A couple of problems --

22             MR. FISHER:  Objection.

23        A.  -- with your question.  First, it doesn't list

24   that I talked to Mr. Oubre -- and that's how you

25   pronounce his last name -- at all.

```
 1          Q.  (BY MR. BITGOOD)  And would you --

 2          A.  It doesn't identify a meeting of three hours --

 3                    THE REPORTER:  Off the record.

 4                    (Brief recess.)

 5          A.  I did not meet with Mr. Oubre.  Secondly, it

 6     was not a meeting for three hours.  It was a meeting for

 7     .3 hours which means between 12 minutes and 18 minutes.

 8     As to what Mr. Fisher and Mr. Oubre discussed I could

 9     not speak to.

10          Q.  (BY MR. BITGOOD)  Okay.  Let's go to 12/16/22.

11     Office conference with Bill Helfand and Bennett Fisher

12     regarding motion to revoke ECF access and appeal.  See

13     that entry there?

14          A.  Yes, sir.

15          Q.  And you felt it necessary to ask this Court to

16     revoke my ECF access?

17          A.  Yes, sir.

18          Q.  Based on the litany of allegations that you put

19     in that pleading.  Correct?

20          A.  I don't know what you mean by the litany of

21     allegations.

22          Q.  Well, you obviously pled something that I'd

23     done wrong.

24          A.  If I could finish my answer.

25          Q.  Go ahead.
```

1        A.   Based on the reasons set forth in the pleading.

2        **Q.   And you also did the same thing at the Fifth**

3   **Circuit.  Correct?**

4        A.   Yes, sir.

5        **Q.   And you told the Fifth Circuit, whoever signed**

6   **the pleading, that I didn't confer with you before I**

7   **asked for ECF access?**

8        A.   I don't have a specific recollection whether we

9   did or didn't.

10       **Q.   Do you recall what happened when the Fifth**

11  **Circuit was shown our certificate of conference how they**

12  **ruled?**

13       A.   I don't recall that the Fifth Circuit was shown

14  a certificate of conference.  I also don't recall the

15  Fifth Circuit's ruling.

16       **Q.   But I e-filed the Fifth Circuit.  Correct?**

17       A.   I don't know the answer to that question.

18       **Q.   Page 13.  At Bennett's instruction, review**

19  **State Bar's website for disciplinary history for Sue**

20  **Norman and Peter Riga.  Attempt to find information for**

21  **unauthorized practice of law against Michael Easton;**

22  **Michael Bitgood.  Review Texas UPL committee website.**

23  **E-mail to BGF regarding my findings at his request for**

24  **commission to prepare memo regarding those findings.  Do**

25  **you see the entry there?**

```
 1        A.  No.  Can you tell me who the person that made

 2   the -- oh, okay.  Is that one, 1/9/23, CR 7?

 3        Q.  Yes, sir.

 4        A.  Yes, sir.  Now, I see it.

 5        Q.  Were you any part of that?  Do you know

 6   anything about that?

 7                MR. FISHER:  Object.  What do you mean by

 8   any part?

 9                MR. BITGOOD:  It says, "At Bennett's

10   instruction."  Was any part of that -- did he have a

11   meeting about that?

12        A.  Is your question did I have a meeting with

13   someone about that?

14        Q.  (BY MR. BITGOOD)  Yes.

15        A.  I don't recall.  I don't have any recollection

16   of having a meeting about that, but that doesn't mean I

17   didn't.

18        Q.  Okay.  On 1/10/23, draft and send e-mail to the

19   unauthorized practice of law committee to request

20   address and individual to request UPL records for

21   Michael Bitgood or Michael Easton.  You see that?

22        A.  I see the entry.

23        Q.  Did you have anything to do with that?

24        A.  Well, it depends on what you mean, anything to

25   do with that.  I'm ultimately responsible for all the
```

1    work in this case as lead counsel.  Are you asking

2    whether I was personally involved in that particular

3    event?

4         Q.  **Yes.**

5         A.  No, I don't think I was.

6         Q.  **Who's SLK, Shane Kotlarsky?**

7         A.  LK?

8         Q.  **Yes.**

9         A.  SLK is Shane Kotlarsky, yes.  I'm sorry.

10        Q.  **It would be on page 15.**

11        A.  Okay.

12        Q.  **Exchange multiple e-mails regarding discovery**

13   **issues.  See that?**

14        A.  Let's see.

15                   **MR. FISHER:**  What's the date?

16        A.  Yeah.  What date is it?

17        Q.  **(BY MR. BITGOOD)  It says 3/3/23.**

18        A.  3/3 is not on page 15.

19        Q.  **Page 16.  I'm sorry.  You copied these back to**

20   **back.  That's why.  They are on back to front.**

21        A.  So I see "Exchanged multiple e-mails with

22   Bitgood regarding discovery issues."  Is that what

23   you're talking about?

24        Q.  **Yes, sir.**

25        A.  Yes, sir.

 1      Q.  To your knowledge, was that in connection with
 2  this case or the Fort Bend case?
 3      A.  That would have had to be in connection with
 4  this case.  I know for sure it was in connection with
 5  this case.
 6      Q.  So there's times you know for sure and there's
 7  times you don't remember.  Is that correct?
 8      A.  No.  I'll tell you if I have personal knowledge
 9  of something and I'll tell you if I don't.  But I have
10  personal knowledge that the 3/3/23 entry is related to
11  this case.
12      Q.  So, Mr. Helfand, is it safe to say that in
13  these records that you've been giving me, unless it has
14  your initials right beside it, you weren't the one who
15  performed the work?
16      A.  I'm going to have to change your question a
17  little bit because that's not an accurate statement.
18      Q.  I asked a question.  Is it safe to say if your
19  initials do not appear to the right as having performed
20  the work, you are not the person who actually performed
21  the work?
22      A.  It depends what you mean performed the work.
23  If you mean performed the task that's listed, then I am
24  not the person -- I only performed a task where my name
25  is listed.

1        Q.  Thank you, sir.

2        A.  As to performing the work, I may have

3   collaborated with somebody on that and simply not put in

4   a billing entry.  There's lots of places where I did

5   work but didn't choose to enter my time.

6        Q.  I've got to go back.  Who is Martin Hughes?

7        A.  Martin Hughes was one of the people who was a

8   witness in the preliminary -- the temporary restraining

9   order -- the preliminary injunction -- I'm sorry -- the

10  preliminary injunction hearing.  He's an employee of the

11  law firm.

12       Q.  You said he was a witness.  You didn't call any

13  witnesses that day.  Was he a --

14       A.  No, he was --

15       Q.  -- potential witness?

16       A.  I'm sorry.  I interrupted you.

17       Q.  Was he a potential witness?

18       A.  Yes.

19       Q.  You didn't call any witnesses.

20       A.  I remember testifying as a witness and I

21  remember Mr. Alto also testifying as a witness.

22       Q.  On 10/6/22 or 12/16?

23            MR. FISHER:  At the TRO.

24       A.  At the temporary injunction hearing.

25       Q.  (BY MR. BITGOOD)  I said temporary restraining

1    order.  That's why I asked you.  Nobody testified at the

2    TRO hearing.

3          A.  Are you asking me a question, Mr. Easton?

4          Q.  I asked you and you said yes, that these people

5    testified.  Are you incorrect?  Nobody testified at that

6    hearing.  That's accurate.  Thank you, sir.  We'll move

7    on.

8          A.  I don't think that's what you asked, but nobody

9    testified at the TRO hearing.

10         Q.  Okay.  Page 14, the billing.

11         A.  I'm there.

12         Q.  1/13/23, prepare motion to dismiss Bitgood's

13   TCPA appeal, 4.8 hours.  Is that in connection with this

14   case?

15         A.  No.

16         Q.  So it's on your billing but it's not in

17   connection with this case.  Correct?

18         A.  It's on our billing draft.  You're not looking

19   at a bill.  You're looking at a billing draft.  See at

20   the left-hand corner on every page says prebill?  That's

21   not a bill.  That's just a billing draft.  You --

22         Q.  This is the document the Court entered a

23   protective order.  Right?  It can't be shown to anybody

24   but attorneys at Mr. Fisher's request?

25         A.  Right.  It's subject to a protective order.

Page 73

1      Q.   Okay.   So it says there, prepare motion to

2   dismiss Bitgood's TCPA appeal.   What court was that in?

3      A.   The 14th District Court of Appeals is my

4   understanding.

5      Q.   Correct.   And then below, review and comment on

6   Easton's finding?

7      A.   Not finding, filing.

8      Q.   Filing.   I'm sorry.   On 1/17 with Shane

9   Kotlarsky.   And then 1/18, revise, finalize and file

10  motion to dismiss Bitgood's state court anti-SLAPP

11  appeal.   What does that have to do with this case?

12     A.   Well, which entry do yo want me to talk about?

13     Q.   Let's talk about the one were it says, revise,

14  finalize, and file a motion to dismiss Bitgood's state

15  court appeal and anti-SLAPP.

16     A.   It is not related to this case.   You've

17  successfully identified, Mr. Easton, that Sean Braun

18  seems to have used the wrong file number for several of

19  his entries and that will not be on a final bill.

20     Q.   Okay.   Because you have no interest in that

21  case.   Correct?

22     A.   No, because it's not related to the prosecution

23  of this lawsuit.

24          MR. BITGOOD:   Can you get the court of

25  appeals docket?

```
 1        Q.  (BY MR. BITGOOD)  Did you and your law firm
 2   file a motion to dismiss my appeal in a case where you
 3   were not a party?
 4        A.  I don't --
 5              MR. FISHER:  Who is you?
 6        A.  I don't --
 7        Q.  (BY MR. BITGOOD)  You being him, LBBS being the
 8   client.
 9        A.  I don't know what lawsuit you're talking about.
10        Q.  The same one we're talking about here, the
11   motion to dismiss Bitgood's anti-SLAPP appeal in the
12   14th Court of Appeals.
13        A.  Yes.  I believe our law firm filed a motion to
14   dismiss that appeal as moot in light of the settlement
15   of the underlying case.
16        Q.  And you were not a party to that appeal.
17   Correct?
18        A.  I am not a party to that appeal.
19        Q.  Do you have a client in that appeal?
20        A.  In that appeal?
21        Q.  Yes.
22        A.  No.
23        Q.  Okay.  So would you read -- this is Exhibit
24   No. 43.  We filed a motion to strike your filing as
25   being interloper.  Can you tell the Court what the court
```

Page 75

1    of appeals ruled?

2         A.  Well, first of all, you said you filed.  Do you

3    mean we?

4         Q.  We filed a motion to dismiss your filings in my

5    appeal for you people, being LBBS and David Oubre as

6    it's written in the order, being interlopers in an

7    appeal that you had no business in.  What was the ruling

8    of the Court?

9         A.  Okay.  Again, you said in your filing.  I

10   don't -- I don't think I made a filing.

11        Q.  Yeah.  Okay.

12             MR. BITGOOD:  Give me his filing.  The

13   letter.

14        A.  If I did, I'm happy to look at it.

15             MS. NORMAN:  Just a second.  What number

16   did I hand you?

17             THE WITNESS:  43.

18             MR. BITGOOD:  The appellate court.

19             MS. NORMAN:  Yeah.

20        Q.  (BY MR. BITGOOD)  Mr. Helfand, I'm going to

21   hand you a document marked as Defendant's E-x No. 39,

22   and it shows a file stamp in the 14th Court of Appeals

23   dated April 21st, 2023.  And it says, "Dear Ms. Young, I

24   write in response to the Court's April 13th letter

25   requesting appellees, Karina Martinez and Imperial

 1    Lofts, an LLC, advise the Court of whether this appeal

 2    is moot."

 3               Right in the middle of the page you say,

 4    "No lawyer of my firm represents Martinez, Imperial Loft

 5    or Imperial Lofts in this appeal."  Is that a true

 6    statement?

 7        A.  Let me see what you're talking about.

 8               MR. FISHER:  Can you show him the document?

 9        Q.  (BY MR. BITGOOD)  I thought you had a better

10    memory, Bill.  I apologize.

11        A.  At the time of this letter, April 21st, 2023,

12    no lawyer of my firm represented Martinez, Sullivan or

13    Imperial Lofts in that appeal.

14        Q.  And so you still filed a motion to dismiss my

15    appeal.  Correct?  And you were not a party to it.  You

16    represented no one in that case, and it appears on this

17    billing in this federal court case.

18        A.  You've just asked me about five different

19    things.  So tell me what you want me to answer.

20        Q.  You represented no one in that appeal.

21    Correct?

22               MR. FISHER:  What appeal?

23        Q.  (BY MR. BITGOOD)  The appeal he's got his hands

24    on.  Okay?  You want me to read the case number?

25        A.  No, no.  I represented no one in that appeal.

1    Q.   Okay.  Did your law firm represent anyone in

2  that appeal?

3    A.   No.

4    Q.   Okay.  The motion to dismiss was filed by David

5  Oubre and Lewis -- LBBS?

6    A.   No.

7    Q.   So then the Court -- look at the Court's order.

8    A.   43?

9    Q.   Yes.

10    A.   Okay.

11    Q.   Read it to the Court.

12    A.   Appellant's motion to strike the motion to

13  dismiss filed by David Oubre and Lewis Brisbois

14  Bisgaard & Smith, LLP is granted.

15             THE WITNESS:  Bless you.

16    A.   But it's not in the document.

17    Q.   (BY MR. BITGOOD)  Huh?

18    A.   I said bless you, but it's not in the document.

19  I thought I heard somebody sneeze.

20    Q.   Again, what does that have to do with this

21  case?

22    A.   Well, I never said it --

23    Q.   Well, it's on --

24    A.   I haven't told you it had anything to do with

25  this case.

1     **Q.   It's on these billing slips.   That's why I'm**
2  **asking.**

3               THE COURT:   One at a time.   One at a time.
4               MR. BITGOOD:   Sorry, sir.
5     A.   Show me the billing entry you're talking about.
6     **Q.   (BY MR. BITGOOD)   Page 14, prepare motion to**
7  **dismiss Bitgood's TCPA appeal.   The date is 1/13/23 is**
8  **when you filed the motion.**

9     A.   Okay.   I didn't file a motion, but,
10  Mr. Bitgood, if all of this was to come back to what
11  I've already told you, which is that Mr. Braun's entry
12  does not belong on this prebill, I'll say it again.
13  Mr. Braun's entry there does not belong on this prebill.
14  And in a final bill, it will not be on the final bill.

15               MR. BITGOOD:   Last page.   Submitted by
16  William S. Helfand.   Okay.   That's --
17               MS. NORMAN:   I've got Exhibit 38 in my
18  hand.   May I hand it to you, please?
19               THE WITNESS:   Thanks.
20     **Q.   (BY MR. BITGOOD)   Would you tell the Court what**
21  **that document is?**

22     A.   It's a pleading in the 14th Court of Appeals.
23     **Q.   What is that pleading requesting?**
24     A.   David Oubre and Lewis Brisbois
25  Bisgaard & Smith, LLP's opposed motion --

```
1              THE REPORTER:  Slow down.

2              THE WITNESS:  I'm so sorry.  Of course.

3        A.  -- opposed motion to dismiss appeal in

4   opposition to appellant's motion to extend time to file

5   appellant's brief.

6        Q.  (BY MR. BITGOOD)  And now -- that's all I asked

7   you was the title of the document.  Would you look at

8   the last page.  In state court they are called

9   electronic signatures under the Civil Practice and

10  Remedies Code.  Who signed the pleading?  Those are

11  exhibits, sir.  Go to the last page.

12              MS. NORMAN:  The last page of the actual

13  pleading.

14       A.  I understand the English language.  David

15  Oubre.

16       Q.  (BY MR. BITGOOD)  The first signature on that

17  line is David Oubre?

18       A.  Yes, sir.

19       Q.  Let me see it again, please.  No, that's not

20  it.  That's the exhibit, Mr. Helfand.  Nice going.  The

21  actual motion.

22       A.  Why don't you show me what you'd like me to

23  read, which, of course, everybody could read without me

24  reading it.  Page 15 of the document you provided me is

25  slash S, William Helfand.  It's not signed either, but
```

```
 1   it does bear my name.
 2        Q.  Well, earlier you testified your name goes on
 3   there with your permission.
 4        A.  Absolutely.  I authorized somebody to put my
 5   name on here to file this.
 6        Q.  In a case that you were not involved in, in a
 7   case you were not a lawyer in, a case where you
 8   represented no one.  Correct?
 9        A.  No.
10        Q.  I'm not correct?
11        A.  You're not correct.
12        Q.  Okay.
13        A.  We were involved.
14        Q.  Who did you represent in that appeal?
15        A.  We didn't represent anyone, but we were
16   involved.  The letter that you gave me was a letter to
17   the clerk in response to the clerk's letter to my law
18   firm asking us to address issues in the appeal.
19        Q.  You're saying the clerk sent your law firm,
20   LBBS, a letter?
21        A.  Give me back the letter that I just -- that you
22   had showed me a moment ago where you quoted me as
23   saying, I nor my law firm represented anyone in this
24   appeal, and I'll show you.  Yeah.  We're looking at
25   Exhibit No. 39, please.
```

Page 81

```
 1        Q.  Yes.
 2        A.  Quote, "I write in response to the Court's
 3   April 18th, 2023 letter requesting appellees Karina
 4   Martinez, Marianna Sullivan, and Imperial Lofts, LLC
 5   advise the Court whether the instant appeal is moot."
 6   That letter came from the Court to my law firm.  That's
 7   why I wrote the clerk back what I wrote.
 8        Q.  Would it surprise you to know it actually went
 9   to Thompson & Coe, their lawyers, not you?
10        A.  Would what surprise me?
11        Q.  That the letter you reference, the statement
12   that I'm writing in response to that letter, that letter
13   went to Thompson & Coe, not to your law firm?
14        A.  That letter came to my law firm.  I wrote based
15   upon that letter.
16        Q.  And you identify it as having no interest in
17   the appeal.  Correct?
18        A.  No.  I said we do not represent any of the
19   people listed by the clerk in which the clerk asked for
20   a response -- for which the clerk asked for a
21   response -- for whom -- I'm sorry.
22        Q.  And that doesn't belong on this billing either.
23   Right?
24        A.  I don't know what that is.
25        Q.  The things that you did in the 14th Court of
```

1    Appeals.  What do they have to do with this case?

2         A.  The things that I did in the 14th Court of

3    Appeals?

4         Q.  The pleading you signed earlier asking the

5    Court to dismiss my appeal, which the Court struck from

6    the record.  What does that have to do with the case

7    before Judge Ellison?

8         A.  I'm going to say for a fifth time.  It does not

9    have anything to do with this pending matter.  I don't

10   believe I billed that here, but if I did, it was in

11   error.

12        Q.  Now, Mr. Helfand, you said you got notice of

13   the dissolution, according to the docket sheet, on

14   October the 11th.  Accepting that date is true, October

15   the 11th, would you agree that that's the date you got

16   the notice of our dissolution?

17        A.  Well, it depends on what you mean by got the

18   notice.  I'm charged with notice when the Court's ECF

19   system transmits it.

20        Q.  Okay.

21        A.  Whether I actually got it.  I can't say.

22        Q.  Okay.

23        A.  Or when I got it.  I'm sure I got it, but when

24   I got it I can't say.

25        Q.  And did you receive a letter from me -- you

1    filed suit September the 23rd.  Did you receive a letter

2    from me dated September 28th offering to submit the case

3    on stipulated facts five days later?

4          A.  I don't recall.

5                MS. NORMAN:  It's not in here.

6                MR. BITGOOD:  I think it is.  Hold on.

7    We're looking for an exhibit.

8          Q.  (BY MR. BITGOOD)  Mr. Helfand?

9          A.  Sure.

10         Q.  I can't find that letter, but I'll ask you the

11   question anyway.  If you don't recall, you don't recall.

12   Do you recall me sending you a letter saying let's

13   submit the case to Judge Ellison today, five days after

14   the suit, and in the letter it said if he rules the name

15   is yours, it's yours.  We go away.  If he says it's

16   ours, it's ours and we're done.  Do you recall receiving

17   any such communication?

18         A.  I don't recall that letter.

19         Q.  I will provide for you when -- but rest assured

20   it was made and it's in the Court's file.  We used to

21   have a docket sheet --

22                THE COURT:  Just ask --

23                MR. FISHER:  No more sidebars.

24                MR. BITGOOD:  Excuse me, sir?

25                THE COURT:  Just ask the question.

```
 1              MR. BITGOOD:  Yes, sir.
 2              MS. NORMAN:  Start from the back.
 3              THE REPORTER:  I can't hear you Mr. --
 4    you're mumbling.  I don't know if you want that to be
 5    part of the record or not part of the record.
 6       Q.  (BY MR. BITGOOD)  Mr. Helfand?
 7       A.  Yes, sir.
 8       Q.  I'm sorry to bother you again.
 9       A.  You're not bothering me.  I'm ready when you
10    are.
11       Q.  Okay.  During the life of this case, did you
12    send an e-mail to Mr. Beers suggesting that he should
13    get me onboard with the settlement offer?
14       A.  I don't recall sending any e-mails to
15    Mr. Beers.  If you have an e-mail I sent, I'm happy to
16    look at it.
17       Q.  I'm happy with your answer, sir.
18       A.  I don't recall sending any e-mails to
19    Mr. Beers.
20              MR. BITGOOD:  Susan, stop.  Don't find it.
21       Q.  (BY MR. BITGOOD)  Mr. Helfand?
22       A.  Sure.
23       Q.  So we do have an agreement that at least on
24    10/6, you knew of the dissolution of this company, ours,
25    the domestic -- very specific, the Lewis Brisbois
```

1    Bisgaard & Smith, LLP Texas was dissolved on 10/6, or at

2    least, by your account, 10/11.  Correct?

3                    MR. FISHER:  I object to the way the

4    question was asked.

5         A.  I can't answer that the way it was asked.  You

6    had a long predicate there.  If you could just give me

7    your question, I can answer your question.

8         Q.  (BY MR. BITGOOD)  Were you aware, at least on

9    10/11, which you've testified earlier that's when the

10   clerk file stamped the document, that the company had

11   been dissolved and a letter was sent to the judge

12   telling the judge the company has been dissolved, we

13   don't want to fight anymore?

14        A.  I was not aware of all those things you just

15   said.

16        Q.  So you didn't know about the docket entry?

17        A.  I know of the docket entry, but not all the

18   ways you characterized what the docket entry said.

19                    MR. BITGOOD:  Let me have that exhibit

20   again.

21                    MS. NORMAN:  The docket?

22                    MR. BITGOOD:  No.  I want the letter to the

23   judge dated October 6th.

24        Q.  (BY MR. BITGOOD)  Mr. Helfand?

25        A.  Yes, sir.

 1        Q.  You testified on 23.  I'm going to hand it to

 2   you again, dated October 6th.  It shows ECF filed.

 3   You've testified that you're responsible for when the

 4   ECF comes up it sends you copy.  Correct?

 5        A.  When the clerk enters something in ECF or a

 6   party enters something in ECF, it's -- it normally sends

 7   a copy.

 8                THE REPORTER:  What exhibit is this?

 9                MR. BITGOOD:  This would be Defendants'

10   Exhibit 23A.

11        Q.  (BY MR. BITGOOD)  It says, Dear Judge Ellison,

12   I enclosed the paperwork filed on even date with the

13   Texas Secretary of State which resolves the grievances

14   as set forth by plaintiff, pro se.  We do this because

15   it is obvious from the Court's gentle reasoning and

16   thoughts as expressed by His Honor on the record, this

17   is the right thing to do.  If plaintiff pro se wants to

18   continue this fight, then we cannot control that.

19   However, not one word that you spoke was lost,

20   therefore, we yield to you.  It summarizes by thanking

21   the judge and attaches the dissolution and the meetings

22   of this Lewis Brisbois.  It shows the file number,

23   dissolution, everything that you could want.  Do you

24   remember receiving this or did you ever see it at all?

25        A.  Yes, I do remember receiving this and I did

```
 1   receive it at all.
 2        Q.  That's the relief you are asking the Court to
 3   grant you.  Right?  The returning of the right to the
 4   name that you claim belongs to you?
 5        A.  That is part of the relief that the plaintiff
 6   has sought in this case.
 7        Q.  Let's go on then.
 8             MR. BITGOOD:  Now you give me that one.
 9             MS. NORMAN:  Which one?
10             MR. BITGOOD:  The one that didn't have the
11   letter attached, his settlement again.
12             THE REPORTER:  Please.  Off the record.
13             (Recess 3:49 p.m. to 3:54 p.m.)
14        Q.  (BY MR. BITGOOD)  Mr. Helfand, if I can
15   distract you from your phone for a moment.
16        A.  Yes.  I'm with you 100 percent.
17        Q.  Okay.  Attached to your -- when you sent the
18   e-mail, you list the settlement demands.  It says, the
19   parties will jointly agree to all of the following:
20   Permanent injunction enjoining defendants, Michael
21   Joseph Bitgood, Jones, Norman, and Beers from using
22   directly or indirectly any of the trademarks, the names.
23   I understand that.  I agreed to do that.  Is that
24   correct?
25        A.  I don't know, Mr. Bitgood.  I don't even know
```

 1   what you're reading right there.

 2       **Q.  Your list of settlement demands that you sent**

 3   **to us.**

 4                **MR. FISHER:**  When?

 5       A.  There were several times that we sent

 6   settlement proposals.

 7       **Q.  (BY MR. BITGOOD)  I'm talking about the one you**

 8   **sent dated 10/14/22.**

 9       A.  I don't have a copy of that.

10       **Q.  Okay.  Let me put it in front of you.**

11       A.  But I do have a record that around October 12th

12   I approved a proposed settlement offer.

13       **Q.  I agreed to the injunction.  Remember?**

14       A.  I don't remember.

15       **Q.  Have you been on any of the videoconferences**

16   **with Judge Ellison and us?**

17       A.  What was the question, sir?

18       **Q.  Have you attended any of the videoconferences**

19   **with Judge Ellison and us with Mr. Fisher leading?**

20       A.  When Mr. Fisher what?

21       **Q.  Was lead counsel.  Address the Court.**

22       A.  I don't recall -- other than temporary

23   injunction hearing I know Mr. Fisher and I were both on.

24   I don't recall subsequent to that if that's what you're

25   asking whether I have or have not been on any -- I know

1   I've been on other conferences with the Court, but I

2   don't recall whether there have been times when both

3   Mr. Fisher and I were both on.

4       **Q.  Do you have the list of settlement demands or**

5   **do you need it from me?**

6       A.  I don't have any document transmitting a

7   settlement demand.  I have a list of the different times

8   that we've made settlement proposals.

9       **Q.  I'm talking about the one that appears in the**

10  **Court's file.  Document 19 filed on 10/14/22.  Let me**

11  **hand it to you now.**

12      A.  Okay.  I have it.  This is document 19, page

13  16.  Exhibit A, page 16.  Got you.

14      **Q.  Do you see Demand No. 1 for permanent**

15  **injunction enjoining?**

16      A.  Yes, sir.  I read the entire thing.

17      **Q.  Okay.  Agreement to wind up and dissolve the**

18  **domestic Lewis Brisbois.  You see that?**

19      A.  That's No. 3.

20      **Q.  4, an agreed order vacating Judge White's**

21  **September 13th order granting the motion to show**

22  **authority and removing David Oubre and Lewis Brisbois as**

23  **counsel for Karina Martinez and you as the Fort Bend**

24  **suit.**

25                  THE COURT:  You're going too fast.

Page 90

1    Q.  (BY MR. BITGOOD)  No. 4, Mr. Helfand.

2    A.  I see No. 4.  You've paraphrased it, but you've

3  generally correctly stated it.

4    Q.  And it lists the cause number of the Fort Bend

5  County case.  You want an agreed order in that case.

6    A.  I don't want that.

7    Q.  Are you not on the settlement -- I mean, the

8  management committee?

9    A.  I was not on the management committee at the

10  time that this letter was written.

11    Q.  Did you not -- this is your list of settlement

12  demands you say.  An agreed order vacating Judge White's

13  findings, his order granting the motion.  And then you

14  list the case number.  Is that correct?

15    A.  This is not my list of settlement demands.

16  This was what my client agreed to do in exchange for

17  dismissing the lawsuit and not seeking to recover

18  damages and attorney's fees.

19    Q.  Okay.  And you represented your client.

20  Correct?

21    A.  Correct.

22    Q.  And you also called yourself as a witness at

23  the temporary injunction hearing.  Correct?

24    A.  Correct.

25    Q.  And you testified as to the grounds why the

 1   Court should grant the preliminary injunction.  Correct?

 2        A.  No.

 3        Q.  You did not?

 4        A.  I testified to some of the facts that underlie

 5   the law firm's claim for damages in the temporary

 6   injunction.

 7        Q.  No. 5, an agreed order vacating Judge White's

 8   September 27th findings.  You see that?

 9        A.  I see that after you paraphrased it, but I

10   understand what you're referring to.

11        Q.  No. 6, entry of judgment in the Fort Bend

12   County case.

13        A.  Yes, sir.

14        Q.  That grants Lewis Brisbois declaratory relief

15   and finds, A, Lewis Brisbois Bisgaard & Smith is and at

16   all times since 2009 been authorized to conduct

17   business.  Do you see No. 6, Mr. Helfand?

18        A.  Yes.  I will tell you -- if it helps you and

19   the court reporter -- I can read it without you reading

20   it to me.

21        Q.  Okay.  No. 6A, would you read it, please?

22        A.  I've read it.

23        Q.  Would you read it out loud, please?

24        A.  Sure.  Lewis Brisbois Bisgaard & Smith, LLP is

25   and at all times since at least 2009 has been authorized

1   to conduct business in the State of Texas State; and.

2        Q.   Just the A.  No. 7, dismiss all claims in the

3   same Fort Bend lawsuit.  Is that correct?

4        A.   Yes, it is the same Fort Bend lawsuit.  Yes,

5   sir.  It's all claims against Mr. Oubre -- now you've

6   got me doing it -- Mr. Oubre and Lewis Brisbois

7   Bisgaard & Smith because by then you were also

8   prosecuting --

9        Q.   What's the --

10                THE COURT:  Let him answer it before

11   anybody else starts speaking.  Mr. Helfand, were you

12   finished?

13                THE WITNESS:  Yes, Your Honor.

14        MR. BITGOOD:  He was speaking, Your Honor.

15                THE WITNESS:  Yes, Your Honor.

16        THE COURT:  Ask next your question, please.

17        Q.   (BY MR. BITGOOD)  No. 8, permanent injunction

18   enjoining each --

19        A.   Basic non-disparagement.

20        Q.   No. 10.

21        A.   Repayment of the filing fees in this action.

22        Q.   That's No. 10?

23        A.   Oh, sorry.  That was 9.  Sorry.  An agreement

24   of defense and indemnity from and for any claims of any

25   other person claiming by or through the defendants to

Page 93

```
 1    have the authority to use any of the trademarked names
 2    or derivatives thereof.
 3         Q.   Okay.  In document 183-53 filed in this case
 4    dated September 29th, '23, page 13 and 14, you've
 5    changed the settlement demands.  Would you read what
 6    No. 8 is into the record?  When I say you, I mean LBBS,
 7    your client.
 8         A.   Yes.  Just to be clear, this is not an e-mail
 9    from me, but I can read what Mr. Kotlarsky wrote under
10    No. 8.  Dismissed Case No. 14-22-694-CV.  Michael Joseph
11    Bitgood a/k/a Michael Easton versus Karina Martinez,
12    Marianna Sullivan, and Imperial Lofts, LLC in the 14th
13    Court of Appeals, Houston, Texas.
14         Q.   Again, what did that have to do with this case?
15         A.   What that had to do with this case is that as a
16    condition of settlement of the Lanham Act case, the law
17    firm wanted a complete and final resolution of all
18    matters between you and everyone related to the lawsuit.
19    So they made a demand in exchange for significant
20    reduction in the attorney's fees and waiving damages for
21    nonmonetary relief as listed in that letter.  The firm
22    was only going to make a full and final and complete
23    settlement, Mr. Easton, just like any other litigant.
24         Q.   Including clients you do not represent because
25    you told the 14th Court of Appeals in this very case you
```

1  represented no one.  You didn't have an interest in the

2  appeal.  You were just answering their letter.  So now

3  your firm is telling me to dismiss my case against other

4  people that you do not represent as part of your

5  settlement demands?

6       A.  A number of statements that you made are

7  incorrect.

8            THE COURT:  Let him finish the question.

9       A.  A number of statements that you made are

10 incorrect --

11           THE COURT:  No.  Let him finish the

12 question.

13           THE WITNESS:  Oh, I'm sorry.  I thought he

14 was.

15      Q.  (BY MR. BITGOOD)  You earlier testified before

16 this Court that you had no interest and it shouldn't

17 be -- if you're going to shake your head before I

18 finish --

19      A.  I didn't say no interest, Mr. Easton.  I said

20 we didn't represent any of the parties to the appeal.

21      Q.  Okay.

22      A.  We did have an interest in that lawsuit.

23      Q.  Could you tell us why you had an interest in

24 it?

25      A.  Because in that lawsuit you filed claims

1    against my law firm and my law partner.

2        **Q.  Well, no, sir.  This is the appeal.  It's an**

3    **interlocutory appeal.  It has nothing to do with you and**

4    **your law firm.  That's the one pending in Fort Bend.**

5    **The one in the 14th Court of Appeals was against people**

6    **you don't represent.**

7            **MR. FISHER:**  My objection --

8        A.  I don't agree with what you said.  What you've

9    said is flatly wrong.  What I said was my law firm and

10   Mr. Oubre have an interest in the lawsuit.  The appeal

11   is simply an interlocutory appeal from that lawsuit.

12   And you have been using that appeal to stay action in

13   this county court at law that would allow Mr. Oubre and

14   my law firm to address those issues, and so my client

15   does have an interest in the outcome of that appeal.

16   What you say incorrectly is my client doesn't represent

17   a party to that appeal, but they have an interest in the

18   outcome of that appeal.  They have an interest in the

19   resolution of that appeal so that the county court at

20   law judge can take up the objections to the associate

21   judge's recommendations which are not yet effective.

22       **Q.  (BY MR. BITGOOD)  Thank you, sir.  Now, beyond**

23   **10/6 or 10/11, what other relief could this Court have**

24   **granted you besides the dissolution?**

25       A.  A permanent injunction.

1     Q.  Wait.  I wasn't finished.

2     A.  Okay.  Well, go ahead and predicate -- that

3  sounded like a question, but go ahead.

4     Q.  You had your agreed permanent injunction as to

5  me.  You had your dissolution as to me on 10/6.  I wrote

6  the judge a letter and told him I'm out 10/6/2022.

7  That's less than a month into the lawsuit.  Okay?

8     A.  Are you testifying now or are you asking me a

9  question?

10     Q.  I'm laying the predicate.  First you complained

11  there's no predicate.  Then you complain you don't

12  understand the question.

13     A.  No.  I'm telling you the predicate is

14  inaccurate and the one you just said is inaccurate as

15  well.  There was no permanent injunction against you.

16     Q.  I know there's no permanent injunction against

17  me.  Mr. Fisher promised the judge he was going to send

18  it over.  He never did.  So that's the proper predicate.

19  Okay?

20     A.  That's not correct, nor is that a proper

21  predicate.  If you have a question, just ask the

22  question.

23     Q.  Mr. Helfand, beyond 10/6/22, you had the

24  dissolution.  Correct?  You had it in hand.

25     A.  Sometime after October 6th, 2022, yes.

```
 1        Q.  Okay.  Minimum of October 6th or October 11th.
 2   You say it's the 11th.  I'll give you the 11th, but you
 3   had it in hand.  Correct?
 4        A.  I don't agree with the dates that you've used,
 5   but I did get it --
 6        Q.  Okay.
 7        A.  -- sometime after you sent it to the Court.
 8        Q.  I agreed to your permanent injunction?
 9        A.  I have no record of you agreeing to a permanent
10   injunction.
11        Q.  Okay.  Beyond that date, what else did you do
12   that was necessary to complete this lawsuit?
13        A.  Everything that you see in the billing records
14   because, one, there was no permanent injunction.  Two,
15   you continued to claim ownership of the trademark.
16   Three, you continued to create totally unnecessary
17   billing for the lawsuit with frivolous comments,
18   personal attacks, and completely groundless things you
19   filed in the Court.  So the relief to which my client is
20   entitled is statutory damages under the Lanham Act,
21   attorney's fees for prosecution of that, and a permanent
22   injunction.
23        Q.  Okay.  And so concerning these frivolous,
24   baseless -- what else did you call my work?
25              THE COURT:  Just ask your next question.
```

1     Q.  (BY MR. BITGOOD)  Your remedy for that is Rule
2  11, is it not?
3     A.  No, it's not.
4     Q.  You further referred to my work in this case as
5  garbage, did you not?
6     A.  I don't have a recollection of using that term,
7  but it might be appropriate.
8     Q.  Would you feel the same way if someone called
9  your work garbage?
10         MR. FISHER:  You have.
11     A.  If I engaged in garbage work, I might be
12  expected to be labeled as doing garbage work.
13     Q.  (BY MR. BITGOOD)  Mr. Helfand, do you recall at
14  the testimony -- I mean, at the hearing of December the
15  15th, which was the temporary injunction hearing, I made
16  an offer of 15 exhibits.  Do you recall if they were
17  admitted?
18     A.  I don't recall that.
19     Q.  Okay.  This was the hearing where the judge
20  asked you do you object and you said I don't know what
21  he's up to, but I don't object and the judge admitted
22  the exhibits.  Do you remember now?
23     A.  I don't recall that.
24     Q.  Okay.
25     A.  I'm not saying it didn't happen.  I just have

 1   no recollection one way or another.

 2        Q.  So what's in evidence so far is the state

 3   court's orders and findings.  That was No. 1.  No. 2 was

 4   the record of the proceedings.  No. 3 was the letter

 5   pleading to the state court informing the state court of

 6   the dissolution.  No. 4 was the status report to the

 7   state court.  No. 5 was the e-mail from Lewis Brisbois'

 8   managing partner stipulating that he would call no

 9   witnesses.  No. 6 was a letter pleading dated August

10   16th to the state court judge.  No. 7, a letter to the

11   state court from Thompson & Coe making clear that Judge

12   White's orders are final and the client will not appeal

13   those orders.  No. 8 was the state court docket sheet.

14   These are all exhibits before this Court.  No. 9,

15   pleading filed August 18th in the state court and using

16   the letterhead of Lewis Brisbois.  Again, no objections

17   there.  No. 10, the pleadings filed in state court dated

18   September 19th.  11, a letter pleading to the state

19   court dated September 28th -- September 26th, three days

20   after you filed the case in federal court.  No. 12,

21   notice to the state court of the statutory stay.  No. 13

22   was a document you filed claiming that the stay was

23   lifted.  14, the response plaintiff pro se's sweeping

24   declaration of judicial mootness.  No. 15 was the

25   Meredith Riede letter which you claim is your client.

```
 1                 THE REPORTER:  Is this an exhibit?
 2                 MR. BITGOOD:  Yes.
 3        Q.  (BY MR. BITGOOD)  Those are documents that have
 4   already been admitted into evidence in this case.  Am I
 5   correct?
 6        A.  I have no idea, Mr. Easton.
 7        Q.  So you weren't there?
 8        A.  Was I where?
 9        Q.  At the hearing, at the temporary injunction
10   hearing?
11        A.  I was at the temporary injunction hearing.
12        Q.  I said, "At this point, Your Honor, I'm going
13   to move to admit Exhibit 1 through 15.  Those are before
14   the Court.  They're certified copies.  If it please the
15   Court, I move to admit 1 through 15.
16                 THE COURT:  Any objection?
17                 MR. HELFAND:  I have no objection, Judge."
18                 THE COURT:  Exhibits 1 through 15, has the
19   other side seen all of them?
20                 MR. BITGOOD:  Yes, sir, I believe.
21                 THE COURT:  Any objection?
22                 THE WITNESS:  I don't think he's offering
23   them now, Judge.  I think he --
24                 MR. BITGOOD:  I'm going to offer them
25   again.
```

Page 101

 1                    **MR. FISHER:**  He's repeating that at the

 2    preliminary injunction hearing that he offered these

 3    exhibits and then Mr. Helfand or I -- which neither of

 4    us objected and then you admitted those documents.

 5    That's all he's done, just explaining that that happened

 6    and he's asking Bill if he remembers --

 7                    **THE COURT:**  Is there any argument about

 8    that?

 9                    THE WITNESS:  No, I told Mr. Bitgood --

10                    **THE REPORTER:**  One at a time.

11                    THE WITNESS:  I think he's asking me.

12                    **MR. FISHER:**  He's asking me or Bill?

13                    **THE COURT:**  I'll ask whoever wants to

14    speak.

15                    THE WITNESS:  I've told Mr. Bitgood three

16    times, I have no recollection whether that did or didn't

17    happen.

18                    **THE COURT:**  Okay.  Are you offering --

19                    **MR. BITGOOD:**  I'll offer them --

20                    **THE COURT:**  -- exhibits.

21                    **MR. BITGOOD:**  Yes, sir.  I'll offer them

22    again.

23                    **THE COURT:**  It's different from offering

24    exhibits in a trial which will be the ultimate test of

25    admissibility.  For the purposes of the record in this

```
 1   deposition, do you object to those 15 documents?

 2                MR. FISHER:  I'd like to see them first.

 3                THE COURT:  Well, that's why I was asking

 4   you.

 5                MR. BITGOOD:  Thank you, sir.

 6                THE COURT:  You okay?

 7                MS. NORMAN:  I'm okay.  I'm handing

 8   Mr. Fisher Document 60 which was filed on November 28th,

 9   2022, in this court.  It was filed with all -- with the

10   first 11 of the exhibits that Mr. Bitgood read the

11   titles of.  This is Document 60.

12                THE COURT:  Okay.  Well, I'm just confused

13   as why we're offering these.  Is it purely for

14   identification?

15                MR. BITGOOD:  Yes, sir.  You've already

16   admitted these exhibits into evidence in this case.

17                THE COURT:  I'm not disputing that.  I just

18   had no memory of it.  I'm sorry.

19                MR. BITGOOD:  That's okay, Your Honor.

20                MS. NORMAN:  I can also offer the witness,

21   Mr. Helfand, Exhibit 33 which is the extract of the

22   transcript with page 33 --

23                THE COURT:  Is this something else in

24   addition to 15?

25                MS. NORMAN:  This is where they were
```

Page 103

1    admitted, Your Honor.

2                    **THE COURT:**  Well, I don't think that's

3    disputed.  Let's just mark them for purposes of

4    identification in this deposition.  That does not waive

5    about admissibility a later hearing.

6                    **MR. FISHER:**  How are we marking these?

7    They've got a stamp saying Exhibit No. 31.  Is that

8    today's 31?

9                    **MR. BITGOOD:**  You don't have to offer those

10   exhibits again because he's already said they're

11   admitted already.

12                    **MS. NORMAN:**  Okay.

13                    **MR. BITGOOD:**  Let's not go through it.

14   Okay?  It's already been admitted.

15       A.  Do you have a question?

16       **Q.  (BY MR. BITGOOD)  Yes, I do.  As an attorney,**

17   **you are aware of the Rooker-Feldman doctrine.  Correct?**

18   **Do you know what it is?**

19       A.  So like so many doctrines, I know generally

20   something about it, but I don't -- I don't apply it or

21   utilize it without rereading it, the cases that it

22   interpreted.

23       **Q.  Do you know what the Rooker-Feldman doctrine**

24   **is?**

25       A.  You know, I get confused between the different

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

1  doctrines.

2              **THE COURT:**  The Rooker-Feldman doctrine in

3  its essence prevents the civil court from interfering

4  with state court litigation.  Let's just use that as my

5  assumption and let's go forward.

6              THE WITNESS:  That would have been one of

7  my guesses.

8      **Q.  (BY MR. BITGOOD)  Mr. Helfand, you've also read**

9  **the opinion of Helfand versus Cohen reported at 12**

10 **Southwest 3rd 152.  Correct?**

11     A.  That has nothing to do with this case and

12 that --

13     **Q.  All I asked is --**

14     A.  -- question violates the judge's order not to

15 harass, embarrass or otherwise run outside of the 56D

16 motion.  You know that case has zero to do with anything

17 we're here about.

18              **THE COURT:**  It really doesn't.  Let's move

19 on.  Let's move on.

20              **MR. BITGOOD:**  Your Honor, if I may.  Judge,

21 if I may, all I asked him was he is aware of the

22 opinion.

23              **THE COURT:**  He is.  He is.

24              THE WITNESS:  I'm aware of it enough to

25 know it has nothing to do with what we're here about.

```
 1              THE COURT:  Let's move on.  We've trod that
 2   path before.
 3              MR. BITGOOD:  Okay, Judge.  And, Judge, if
 4   I may.  For the sake of this deposition -- and I meant
 5   to do that when we got started -- could I ask you to
 6   take judicial notice of the entire proceeding right now
 7   where we sit, please?  Under Rule --
 8              THE COURT:  Take notice of it, that we are
 9   in a deposition?
10              MR. BITGOOD:  No, sir, of the entire
11   proceeding under Rule 201.
12              THE COURT:  The entire what?
13              MR. FISHER:  Proceedings.
14              THE COURT:  State proceedings?
15              MR. BITGOOD:  No, sir.  Cause No. 4:22, the
16   one you're presiding over.
17              THE COURT:  Take judicial notice of it?
18              MR. BITGOOD:  Yes, sir.
19              THE COURT:  What does that mean?
20              MR. BITGOOD:  It means you take judicial
21   notice of the entire proceeding.  You presided over it.
22   You know the docket entries.  You know the case.
23              THE COURT:  It's my case, and I'll
24   administer the case like I do any other.  It certainly
25   includes knowledge of what's in the file.
```

1       MR. BITGOOD:  Thank you, sir, because I

2  don't want to make a summary judgment motion that's this

3  high.  If you take judicial notice of it --

4       THE COURT:  I'll take judicial notice of

5  the case of which I am responsible --

6       MR. BITGOOD:  Thank you, sir.

7       THE COURT:  -- to do for all cases in which

8  I'm responsible.

9       MR. BITGOOD:  Thank you so much.  I'm not

10  trying to be fussy.  I just want to shorten the paper.

11              I'll pass the witness at this time, Your

12  Honor.

13       THE COURT:  Thank you.  Can we adjourn or

14  is there another witness?

15       MS. NORMAN:  I've got -- I have a couple of

16  questions, Your Honor.

17                    EXAMINATION

18  BY MS. NORMAN:

19     Q.  Mr. Helfand, I'm going to hand you what's

20  marked previously as Exhibit 22.  It was -- it's

21  document 10-6 which was filed October the 6th, 2022, in

22  this case.  Can you identify what that is?

23     A.  It is document 10-6 filed on October 6th, 2022,

24  in this case.

25     Q.  Okay.  What does it appear to be to you?

Page 107

 1          A.  It appears to be an e-mail from Mr. Easton to

 2     someone named Brice Beale slash Bryce Spencer and then

 3     an e-mail from Meredith Riede to Norman Giles.

 4          **Q.  Okay.  I'm going to hand you what's been marked**

 5     **as Exhibit No. 8.  And if you'll look at the body -- of**

 6     **course, the print is smaller -- if you'll look at the**

 7     **body of that e-mail on Exhibit 8 and compare it to**

 8     **Exhibit No. 22, please, sir.**

 9          A.  I'm not qualified to compare the two documents.

10          **Q.  Are the words the same?**

11          A.  You want me to sit here and read all of this

12     document and then read the other one and tell you if the

13     words are the same?

14          **Q.  The only thing I want you to read is the e-mail**

15     **body text.**

16          A.  Right.  Three paragraph -- just so we're clear,

17     you want me to read every word in both e-mails and tell

18     you if they're the same words?  That's your question?

19          **Q.  Yes, sir.**

20          A.  Okay.

21               **THE COURT:**  Hold on a second.  Do you have

22     any reason to believe they're different, Mr. Helfand?

23               THE WITNESS:  They don't appear to be

24     different from a bird's-eye view, Your Honor.

25               **THE COURT:**  Okay.  I'm not going to ask him

Page 108

```
 1   to read the whole document.
 2                 MS. NORMAN:  Thank Your Honor.
 3                 THE COURT:  If there's something you want
 4   to point him to and ask if it's different, I'll allow
 5   you to do that.
 6        Q.  (BY MS. NORMAN)  Okay.  If you will look on the
 7   second page of Exhibit No. 8.  You have previously
 8   testified that the fact that that letterhead exists and
 9   was sent as an attachment to that e-mail sent to
10   Ms. Riede that that was confusing to her -- could have
11   been confusing -- and constituted -- if I'm paraphrasing
12   incorrectly, I'm sure you'll correct me -- an offer of
13   legal services.  Did I say that correctly?
14        A.  Will you show me the testimony to which you are
15   referring?
16        Q.  It's what you said earlier today.
17        A.  No, I did not say the things you just said
18   earlier today.
19        Q.  Okay.  When you look at that second page below
20   the letterhead, what is the date?
21        A.  Below the horizontal line?
22        Q.  Yes, sir.
23        A.  August 17th, 2022.
24        Q.  Is there a case number?
25        A.  Yes.
```

Page 109

```
 1        Q.   Okay.  What case number is that?

 2        A.   22-CCV-070378.

 3        Q.   And does it appear to be the lawsuit filed in

 4   Fort Bend County Court At Law No. 3, Richard Jones,

 5   Michael Joseph Bitgood a/k/a Michael Easton, Lewis

 6   Brisbois Bisgaard & Smith, LLP versus Karina Martinez,

 7   Marianna Sullivan, Imperial Lofts, LLC, and the

 8   remaining defendants that you earlier gave the name

 9   spelling for?  Does that appear to be correct?

10        A.   Well, it's not a lawsuit.  It's just those

11   names.

12        Q.   Okay.

13        A.   You asked me if it appears to be a lawsuit.  It

14   does not appear to be a lawsuit.  It appears to be a

15   letter.

16        Q.   Okay.  May I hand you Exhibit No. 8A.  Do you

17   see that that unfiled -- the document you just -- we

18   just looked at has not been filed previously as attached

19   to Exhibit -- I think it's 8 -- but that would -- is

20   there a file stamp on that document up at the right-hand

21   corner?

22        A.   What is that document?

23        Q.   8A.

24        A.   There is a file stamp in the upper right-hand

25   corner from the county clerk of Fort Bend County, Texas.
```

Page 110

1      Q.  And will you briefly look at the pages in 8A
2  and tell me if this is a letter addressed Meredith
3  Riede?
4      A.  There's no way to tell from looking at this
5  whether it's a letter addressed to Meredith Riede.
6      Q.  Do you see Ms. Riede's name in there?
7      A.  There's 18 pages.  I don't -- I'm not going to
8  look for Ms. Riede's name in here.
9      Q.  Okay.  May I have that back, please?
10     A.  Sure.
11     Q.  Thank you.  Do you have a partner in the
12 California office named Daniel DeCarlo?
13     A.  Well, we have more than one office in
14 California.
15     Q.  Okay.
16     A.  But I do have a partner named Dan DeCarlo.
17     Q.  Okay.
18     A.  Daniel DeCarlo, yes.
19     Q.  Do you have any personal knowledge of what his
20 area of general practice is, his focus area?
21     A.  Yes.  He's a litigator.
22     Q.  Litigator?  Okay.  Does he litigate trademarks
23 or does he deal with trademarks and patents?
24     A.  He is an intellectual property lawyer, among
25 other things.

1          **MS. NORMAN:**  Okay.  Pass the witness.

2                    EXAMINATION

3    BY MR. DUNWOODY:

4          **Q.  Marked for identification is a document labeled**

5    **LBBS Fees 1 to 44.**

6          A.  I have a copy here.

7          **Q.  Would you describe what this document is**

8    **generally?**

9          A.  This is a prebill for time entries related to

10   work in the prosecution of this lawsuit and as

11   Mr. Bitgood has pointed out as to some entries, some

12   entries that do not belong on a final bill related to

13   this matter.

14         **Q.  Okay.  Is there an engagement letter between**

15   **the law firm and you as the attorney representing it or**

16   **any of the lawyers at LBBS to represent the law firm?**

17         A.  Not for this matter.

18         **Q.  Is there a general engagement letter that would**

19   **be applicable to cover this matter?**

20         A.  I don't know the answer to that question.  I

21   don't think so, but I don't know.

22         **Q.  Have any invoices been issued from LBBS**

23   **essentially to itself relating to this matter?**

24         A.  No.

25         **Q.  What's the process for how that occurs?**

1          **MS. NORMAN:**  Excuse me.

2          **MR. DUNWOODY:**  Bless you.

3      A.  Well, for this matter or any other in which

4  there are recoverable attorney's fees, depending upon

5  the arrangement with the client, the bill will not be

6  generated until the completion of all work which is the

7  case here.  In some cases the client will pay an hourly

8  fee but there will be a contingency as to some portion

9  of the fee.  So a regular bill will go out for the --

10  for that portion that the client has agreed to pay on a

11  regular basis.  And then, of course, there are cases

12  where the client agrees to pay either a quarterly or

13  monthly or some other frequency bill in the prosecution

14  of a lawsuit and we simply bill them for that at the end

15  of whatever that term is.

16      **Q.  (BY MR. DUNWOODY)  I'm specifically concerned**

17  **about the instance where the law firm is representing**

18  **itself.  Is there any written memorialization of how the**

19  **invoices will be generated, how the fees will be paid**

20  **relating to this action?**

21      A.  Relating specifically to this action?

22      **Q.  Yes, sir.**

23      A.  Not that I recall.

24      **Q.  Who would know the answer to that?**

25      A.  I would.

1    Q.   To date, no invoices have been finalized and

2  issued.   Are there currently plans to finalize and issue

3  invoices relating to this matter?

4    A.   Well, you said -- the first thing you said was

5  wrong.   No invoices have been finalized is not correct.

6  Once an invoice is created, it is finalized.   Invoices

7  aren't finalized.   Billing entries are finalized into an

8  invoice.

9    Q.   Have any invoices relating to this matter been

10 generated?

11   A.   No.   All time remains in prebill status.

12   Q.   So no invoices have been created relating to

13 this matter?

14   A.   That's correct.

15   Q.   Have any payments been made relating to this

16 matter in terms of attorney's fees?

17   A.   Yes.

18   Q.   Could you explain?

19   A.   Sure.   The firm has redirected attorneys who

20 would ordinarily be billing the same amount of time to

21 regularly-paying clients to do the law firm's legal

22 work.   And so in that -- and the law firm continues to

23 compensate those lawyers as if their work was work that

24 would generate fees from a fee-paying -- regular

25 fee-paying client, the firm has had to rededicate those

Page 114

```
 1   people to the prosecution of this lawsuit.  So in that
 2   regard, the firm has incurred an equivalent expense of
 3   everything that's properly on the prebill.
 4        Q.  In my experience, that's referred to as giving
 5   somebody work credit for something that's done.  Is that
 6   the same nomenclature you use at your firm?
 7        A.  No.
 8        Q.  How do you describe it?
 9        A.  What I just said.  The firm took -- whether
10   it's Bennett Fisher or Shane Kotlarsky or Bill Helfand
11   and asked them to set aside work for other clients and
12   took on the expense of prosecuting this matter by
13   dedicating its own counsel who otherwise would be
14   generating fees from other work, and at the same time
15   the firm continues to pay those lawyers based upon their
16   work the same way that they would pay if they were
17   working for other clients.
18        Q.  (BY MR. BITGOOD)  Okay.  I appreciate -- my
19   question must not have been clear because you gave the
20   same answer, but I was trying to ask you something
21   different.
22        A.  Well, you asked me how do I call it.
23            THE COURT:  No, no, no.  If you're not
24   satisfied with the answer, ask another question.
25        Q.  (BY MR. DUNWOODY)  I want to make clear what it
```

```
 1   is that I'm trying to ask you.  I'm not asking about the
 2   internal process of how it works.  What do you call it
 3   when you're paying someone for work that they're doing
 4   on a firm matter?  Is there a shorthand name for how you
 5   refer to that?
 6        A.   We don't have a term for that.
 7        Q.   And so each of the billing timekeepers, were
 8   they paid the amounts that show up on the prebill or
 9   were they paid some lesser amounts?
10        A.   The lawyers are all paid a salary.  Every
11   lawyer's salary exceeds anything on that prebill in
12   terms of an entry, if that's what you're asking.  I
13   don't understand what you're asking.
14        Q.   Down at the bottom -- let me move on to this
15   line of questioning.  Down at the bottom of this LBBS
16   document starting with Bates No. 1 it says
17   noninstitutional.  What does that mean?
18        A.   So the firm has -- we've actually abandoned
19   that, but back when this case was opened, we were under
20   an accounting system that required an identification for
21   the accounting system of whether the client was
22   institutional or noninstitutional.  And one of the
23   reasons we've abandoned that is, first of all, we
24   abandoned that accounting system, but also because there
25   was no firm -- as in solid, firm-wide definition of what
```

1  an institutional versus noninstitutional client was.  So

2  all that means is whenever the nice lady who is now

3  retired who opened this file opened it, she had to pick

4  one or the other and she chose one without regard to any

5  guiding principles.

6       **Q.  At the end of the prebill, if we look at page**

7  **43, there are handwritten notes on there.  Do you see**

8  **those?**

9       A.  Uh-huh.

10      **Q.  Whose notes are those?**

11      A.  I can't tell.  I don't know.  Somebody's

12  initials are on there, but I don't know whose initials

13  those are.

14      **Q.  What was the purpose of those handwritten**

15  **notes?**

16           MR. FISHER:  You're asking him to

17  speculate.

18      A.  Yeah.  I was going to say, I don't know.  I

19  don't know.

20      **Q.  (BY MR. DUNWOODY)  I see some stars that**

21  **indicate duplicate entries.**

22      A.  You have to show me where you're --

23      **Q.  It's on page 43 and 44.  Do you see the**

24  **asterisk and it says duplicate entries?**

25      A.  I see a star and the word "duplicate entries."

1    Q.  All right.  And you see the same thing on the

2  next page, 44?

3    A.  I see a star and the word "duplicate entries."

4    Q.  Did you task someone with going through and

5  reviewing the prebill for duplicate entries?

6    A.  I did not.

7    Q.  Who was responsible for reviewing this prebill

8  and applying redactions to it?

9    A.  Ask that question again, please.

10    Q.  Who was responsible for reviewing the prebill

11  and applying redactions to it?

12    A.  Applying the what?

13    Q.  Redactions.

14    A.  Oh, the redactions.  I don't know who the

15  person was that did the redactions or who the person is

16  who did the redaction.

17        MR. DUNWOODY:  Your Honor, may I approach

18  with a copy of this?

19        THE COURT:  Yes, you may.  You have a copy

20  for my law clerk?

21        MR. DUNWOODY:  I do.  Your Honor, a number

22  of these entries are blocked out, blacked.  We don't

23  have an explanation as to what the asserted privilege is

24  that goes along with them and we would ask that the

25  Court require that they be produced in an unredacted

```
 1   form.  I'd note, first off, that many of these entries
 2   relate to things that happened at least 18 months to two
 3   years ago.  The chance that there being anything
 4   that's --
 5            THE COURT:  You said these happened
 6   sometime 18 months or two years ago and it is unlikely
 7   of being any privileged?
 8            MR. DUNWOODY:  Anything that's work product
 9   that would be time sensitive, where it's likely to
10   reveal some litigation strategy that's not otherwise
11   evident.
12            THE COURT:  I'm not prepared to rule on
13   several dozen pages of legal fees.  What I would suggest
14   is that if you -- it is something that was produced to
15   you some time ago?
16            MR. DUNWOODY:  Yes, Your Honor.  It was not
17   produced today.  It was produced, you know, some matter
18   of weeks ago.
19            THE COURT:  Then file a motion to compel
20   and I'll get plaintiff to respond to it and then I'll --
21            THE REPORTER:  Judge, can I get you to
22   speak up, please.  I can't see you or hear you.
23            THE COURT:  What I said was I'm not
24   prepared to rule on dozens of pages of legal fees today.
25   If anyone would like to file a motion to compel and I
```

1  get the plaintiff's response, I'll then rule on it.  I'm

2  not going to rule on it today.

3                    MR. BITGOOD:  Your Honor?

4                    THE COURT:  Yes.

5                    MR. BITGOOD:  Just to remind you, we can't

6  file anything.  We're enjoined from filing any

7  pleadings.

8                    THE COURT:  I'll revisit that.  I'll

9  revisit.

10                    MR. BITGOOD:  Thank you.

11                    MR. DUNWOODY:  Your Honor, may we take this

12  opportunity to move for leave to file a motion to compel

13  on this limited issue?

14                    THE COURT:  I'll take it under advisement.

15  I'll take it under advisement.

16                    MR. DUNWOODY:  Should we re-urge that in

17  writing?

18                    THE COURT:  Yes.

19      Q.  (BY MR. DUNWOODY)  All right.  Mr. Helfand, on

20  page 1 of the document that we're looking at there's an

21  entry on 9/22/22.  Do you see it?

22      A.  Yes, sir.

23      Q.  And it says, Continue preparing federal

24  complaint against Bitgood and his counsel.  Does that

25  refer to Brad Beers?

Page 120

```
 1        A.   No.

 2        Q.   Who does it refer to?

 3        A.   I think it refers to Ms. Norman, but we would

 4   have to ask Mr. Braun.

 5        Q.   Okay.  I've gone through and added up the

 6   entries from the beginning of this prebill until the end

 7   of the day on October 6th.  I see the grand total comes

 8   to $40,870.  Does that sound roughly right?

 9        A.   No, I have no idea.  I have no idea whether

10   you've done it correctly.  I've not made any

11   calculations.

12        Q.   For purposes of this discussion --

13        A.   Can I finish my answer?

14        Q.   -- assume with me for a moment --

15        A.   Can I finish my answer?

16             THE REPORTER:  One at a time, please.

17        A.   I've not made any calculations.  So I'm not

18   going to agree with or disagree with your calculations

19   at all.

20        Q.   (BY MR. DUNWOODY)  Fair enough.

21        A.   And I'm not going to answer any questions based

22   on your purported calculations.

23        Q.   And then if we go to the last page of the

24   document, the grand total according to this prebill is

25   $422,575?
```

Page 121

```
1        A.   No.  It's $425,585.

2        Q.   I'm sorry.  I was looking at the handwritten

3   notes there.

4        A.   The handwritten note says 422,575.

5        Q.   I'm sorry.  Which is the official version, the

6   one with the handwritten notes or is there some other

7   version that's the official version?

8        A.   The printed version is the grand total of

9   what's on the document.

10       Q.   Okay.  And that's --

11       A.   When I say printed, I mean printed by the

12  computer, not somebody's handwriting.

13       Q.   Okay.  And that's more than ten times $40,000.

14  Fair?

15       A.   Yeah, that number is more than ten times

16  $40,000.

17       Q.   And as of October 6th, 2022, the entity that

18  your client was upset about having been created was

19  dissolved.  Yes?

20       A.   I didn't understand your question.

21       Q.   As of October 6th, 2022, the entity that your

22  client was upset about having been formed, that entity

23  was dissolved that day.  True?

24       A.   Yes.  Well, I don't -- sorry.  I don't know if

25  it was done on October 6th, but I've seen filings that
```

1   were submitted on October 6th.

2        Q.  If I look at the end of the prebill, we have

3   two different tables down at the bottom that are

4   timekeeper tables.  Could you explain, what's the

5   difference between those two timekeeper tables?

6        A.  I don't know where you see -- I only see on the

7   last page one timekeeper table.

8        Q.  If you look at the last two pages, so starting

9   on page 43.

10       A.  Okay.

11       Q.  We have a table there that says timekeepers.

12       A.  Yes, sir.

13       Q.  And it looks like it continues on to page 44

14   and then there's another timekeeper table.  I was asking

15   you to explain, what's the difference between those two?

16       A.  What it says there.  It says timekeepers in the

17   first table and the second table says timekeeper

18   life-to-date.

19       Q.  And what's the reason for the distinction

20   there?

21       A.  Well, when we look at a prebill, we want to

22   know how much time is on that prebill.  That's the

23   timekeeper.  And we want to know how much time for that

24   person has been billed to the matter to date, which is

25   beyond the current prebill, when we have generated one

Page 123

```
 1    or more invoice.
 2         Q.  Okay.  So it would make a difference if
 3    there -- multiple invoices had previously been
 4    generated?
 5         A.  If there had been one or more previous
 6    invoices, there should be a different number between
 7    timekeeper, which is the present amount of time, and
 8    timekeeper life-to-date, which is the cumulative amount
 9    of time.
10         Q.  One of the claims that's asserted in this
11    action is for violation -- or for infringement of a
12    registered trademark.  And I guess there are multiple
13    registered trademarks that plaintiff is asserting have
14    been infringed.  Is that correct?
15         A.  I'd have to look at the pleading to be able to
16    answer that question.
17         Q.  You acknowledge that Lewis Brisbois does not
18    have a registered word mark for its firm name?
19         A.  I don't agree with that.  I don't know one way
20    or the other.
21         Q.  You understand that in order to recover
22    statutory damages the plaintiff -- that claim has to be
23    for violation of a registered mark.  Right?
24         A.  You're asking for my legal conclusion, and I'm
25    not going to give you my legal opinions.
```

```
 1          Q.  You don't acknowledge that?
 2          A.  I'm not going to speak about my legal opinions.
 3               MR. FISHER:  Ask him facts.
 4          Q.  (BY MR. DUNWOODY)  It's a fact that Lewis
 5     Brisbois doesn't have a registered word mark for its
 6     firm name.  True?
 7          A.  I don't know the answer to that question which
 8     is I think what I told you two questions ago.
 9          Q.  At what point will there be a final invoice
10     issued for this matter where someone has gone through
11     and vetted it to remove the extraneous things and to
12     exercise billing judgment and making appropriate
13     reductions for duplicate entries, things of that nature?
14          A.  When -- if the Court awards attorney's fees,
15     then ordinarily what happens in this district is the
16     Court then requires a submission of evidence of
17     attorney's fees and then that will be reduced to a final
18     bill.  It may still be in prebill form, but it will be a
19     prebill form that is susceptible to final billing.
20          Q.  More thoroughly vetted prebill?
21          A.  Fair to say.
22          Q.  And it's fair to say that if you were the one
23     going through and reviewing this particular prebill, you
24     would exercise judgment and remove or reduce some of the
25     entries that we've seen on there?
```

1     A.  Yes.  I would say remove -- well, yes, I'd look

2   at it for both those purposes, yes, sir.

3     Q.  **What goods or services were sold under the**

4   **allegedly infringing entity's name?**

5     A.  I don't understand your question.

6     Q.  **I asked you what goods or services were sold**

7   **under the allegedly infringing entity's name?**

8     A.  I heard you.  I don't understand what you're

9   asking.  Repeating your question doesn't help me.

10     Q.  **What is it about the question that you didn't**

11   **understand?**

12     A.  The whole thing.

13     Q.  **As you sit here today, can you identify any**

14   **allegedly infringing goods or services that were sold by**

15   **any of the defendants?**

16     A.  I don't know what you mean by infringing goods

17   or services.  Goods and services don't infringe.  Goods

18   and services are things.  So I don't understand what

19   you're asking.

20     Q.  **You don't know what an allegedly infringing**

21   **good or service is?**

22     A.  I know what allegedly -- I don't understand the

23   question.  I'm not going to try and help you fix it.  I

24   don't understand your question.

25     Q.  **You don't know?**

1    A.   No, I don't not know.  I don't even understand
2 what you're asking.
3    Q.   **What goods or services did the defendant sell**
4 **that the plaintiff has an issue with?**
5              MR. FISHER:  Do you understand?
6    A.   You asked me what goods and services the
7 plaintiff sold?
8    Q.   **(BY MR. DUNWOODY)  No.**
9              MS. NORMAN:  Defendants sold.
10   A.   What was the question?
11   Q.   **(BY MR. DUNWOODY)  What goods or services that**
12 **the defendants sold does the plaintiff have an issue**
13 **with?**
14   A.   Well, they advertised for sale mediation and
15 arbitration services.  They told the judge that they
16 adopted the name for the very purpose of using it to
17 sell mediation and arbitration services.
18   Q.   **Okay.  But my question is what did they sell**
19 **that the plaintiff has an issue with?**
20   A.   Mediation and arbitration services.
21   Q.   **To who?**
22   A.   I don't know.  They haven't revealed that.
23   Q.   **As far as you're aware, there have been no**
24 **goods or services actually sold.  Fair?**
25   A.   No, I wouldn't say that.  I don't know whether

```
 1   there have or haven't.
 2        Q.   So as far as you know, there are not?
 3        A.   No, I don't agree with that.
 4        Q.   Have any prebills been submitted to the
 5   management committee?
 6        A.   I don't know.
 7        Q.   Who would know that?
 8        A.   I would.  I should say I don't recall one way
 9   or the other.  I don't recall one way or the other.
10             MR. DUNWOODY:  All right.  I pass the
11   witness.
12                    FURTHER EXAMINATION
13   BY MR. BITGOOD:
14        Q.   I just have a few more questions for you,
15   Mr. Helfand.
16             THE COURT:  Can we excuse this witness?
17             MR. BITGOOD:  Your Honor, I have a few
18   more.
19        Q.   (BY MR. BITGOOD)  Mr. Helfand, earlier
20   Mr. Dunwoody asked you and you couldn't tell him whether
21   you owned the word mark.  Correct?
22        A.   I don't know whether the firm does or not
23   own what Mr. Dunwoody called a word mark.
24        Q.   You don't know if they own it.  Correct?
25        A.   I don't know whether they do.  I don't know
```

```
 1   whether they don't.

 2        Q.  Okay.  So you brought this lawsuit and in your

 3   pleadings you placed that you had the patent.  I want to

 4   make sure we're clear on that.  Your new word mark,

 5   according to the patent office, was effective 10/31 of

 6   '23, but you brought this lawsuit 9/23 of '23.  We had a

 7   state court order and a state court finding that said we

 8   were legally authorized to use the name Lewis Brisbois.

 9   We gave up on the 6th after listening to this man's --

10   His Honor's words that it just generally was not a good

11   idea.  We had expedited discovery served on us which we

12   had to answer in five days.  And yet you tell

13   Mr. Dunwoody that you have no idea of who sold any goods

14   and services despite the answers to discovery and

15   despite being sanctioned $1,000 for not responding fast

16   enough.  Is that your testimony under oath, sir?

17        A.  I don't agree with most of the things you just

18   said, Mr. Easton, so I'm not going to answer question.

19   Your predicate is completely false.

20        Q.  Mr. Helfand, you do this constantly.  You

21   evade.  You obfuscate.  You don't want to answer the

22   question.

23                  MR. FISHER:  All right.  No sidebars.

24                  MR. BITGOOD:  I'll break it down.

25                  THE COURT:  We don't need this.  We don't
```

```
 1    any of this.  State your question over again.  Let me
 2    make a ruling on it.
 3                    MR. BITGOOD:  Okay, sir.
 4         Q.  (BY MR. BITGOOD)  You brought the lawsuit not
 5    knowing one way or another if you owned the word
 6    trademark.  Correct?
 7         A.  No.
 8         Q.  So what you told him you didn't know, but now
 9    you know for me.  Did you own the word trademark?
10         A.  What you just said is completely inaccurate.  I
11    am a person.  He asked me my personal knowledge.  The
12    firm knows information that I may not have.
13         Q.  But you signed the pleadings, did you not?
14         A.  Yes, based upon --
15         Q.  On behalf of the firm.
16         A.  Based upon information from my client.
17         Q.  Okay.  We had the state court judgment dated
18    September 13th that says we were Lewis Brisbois.  You
19    were aware of that?
20         A.  No.
21         Q.  You didn't know that.
22         A.  I've never seen a judgment that says you are
23    Lewis Brisbois.
24         Q.  You've got an order striking pleadings removing
25    you from the case and findings of fact that says that we
```

Page 130

```
 1    are Lewis Brisbois, but that's not good enough?
 2         A.   That's not even true.  That's not even
 3    accurate.
 4         Q.   Okay.
 5         A.   No judge has found that you have the right to
 6    use the name Lewis Brisbois.
 7              MR. BITGOOD:  Excuse me a second.  Susan,
 8    let me have that one right there on top.
 9              THE REPORTER:  Exhibit number, please.
10              MR. BITGOOD:  Exhibit No. 15.
11         Q.   (BY MR. BITGOOD)  This is the Finding of Fact
12    No. 4 from the state court:  The only testimonial
13    evidence put on at the hearing, was sworn testimony from
14    Plaintiff, Michael Joseph Bitgood as president of Lewis
15    Brisbois Bisgaard & Smith, a domestic Texas LLP.
16    Despite the extensive testimony of Mr. Easton, Mr. Oubre
17    did not cross-examine.  Thus the Court credits
18    Mr. Easton's testimony as credible and conclusive.  You
19    and I might disagree about what credible means in light
20    of Helfand vs Cohen and you may also disagree with me as
21    to what conclusive means.  But on this last page it
22    removes you from this case, finds that you're not
23    licensed, okay, or your firm is not authorized to do
24    business in Texas for whatever reason.
25              THE COURT:  Is this a question then?
```

1          MR. BITGOOD:  Yes, sir.

2      A.  Show me in the order where it says you have the

3  authority to use that name.  It doesn't say it,

4  Mr. Easton.  It doesn't say it.  No judge has ever said

5  anyone other than this law firm has the authority to use

6  that name.

7      Q.  (BY MR. BITGOOD)  To the contrary, the Rule 12

8  removed you for lacking authority.  Is that not true?

9      A.  No, that is not true.

10     Q.  Okay.

11     A.  You don't understand what the Rule 12 order

12  says.

13     Q.  I don't understand what a Rule 12 order is?

14     A.  You obviously do not understand what that order

15  said.

16     Q.  Okay.  And you claimed that we formed this --

17  you said I told the judge we did it for what purpose

18  again?

19     A.  You thought it would be a good idea for your

20  mediation services.

21     Q.  Okay.  But you didn't bother to read the rest

22  of it, did you?

23          THE COURT:  Okay.  We don't need this.  Ask

24  your question.  Ask the question.

25     Q.  (BY MR. BITGOOD)   Okay.  Have you seen Docket

1   **69?  That's all I'll ask you.**

2        A.  In this case?

3        **Q.  Yes, sir.**

4        A.  At some point I'm sure I saw Docket 69.  I have

5   no idea what it is.

6                   MR. BITGOOD:  Pass the witness, Your Honor.

7                   THE COURT:  Can we excuse this witness?

8                   MR. DUNWOODY:  Yes.

9                   THE COURT:  Thank you.

10                   THE REPORTER:  Are there any other matters

11   for the record?

12                   THE COURT:  None from the Court.

13                   MR. FISHER:  We would just like to have an

14   opportunity to read and sign.

15                   THE REPORTER:  Thank you.

16                   THE COURT:  You may be excused, gentlemen.

17                   (The Deposition concluded at 4:55.)

18

19

20

21

22

23

24

25

Page 133

```
 1                    CORRECTION PAGE.

 2   WITNESS NAME:  WILLIAM SCOTT HELFAND    DATE: 03/13/2024

 3          PAGE   LINE  CHANGE              REASON

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1                      SIGNATURE PAGE
 2
        I, WILLIAM SCOTT HELFAND, have read the foregoing
 3   deposition and hereby affix my signature that same is
     true and correct, except as noted on the correction
 4   page.
 5
 6                    _____
                     WILLIAM SCOTT HELFAND
 7
 8
 9
     THE STATE OF TEXAS        )
10   COUNTY OF _____ )
11
        Before me _____ on this day
12   personally appeared _____ known to me
     [or proved to me on the oath of _____ or
13   through _____ (description of identity
     card or other document)] to be the person whose name is
14   subscribed to the foregoing instrument and acknowledged
     to me that he/she executed the same for the purposes and
15   consideration therein expressed.
        Given under my hand and seal of office this _____
16   day of _____, 2024.
17
18
19                    _____
                     NOTARY PUBLIC IN AND FOR
20                   THE STATE OF T E X A S
21
     My Commission Expires:
22   _____
23
24
25
```

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT COURT OF TEXAS
 2                    HOUSTON DIVISION
 3   LEWIS BRISBOIS BISGAARD &     )
     SMITH, LLP,                   )
 4                                 )
                 Plaintiff,        )
 5                                 )
     VS.                           )   Case No. 4:22-cv-3279
 6                                 )
     MICHAEL JOSEPH BITGOOD a/k/a )
 7   "Michael Easton," et, al      )
                                   )
 8               Defendants.       )
 9
10                   VOLUME 1 OF 1
                  ORAL DEPOSITION OF
11              WILLIAM SCOTT HELFAND
                   MARCH 13. 2024
12
13
         I, MONICA VICTOR, Certified Shorthand Reporter and
14   Notary Public in and for the State of Texas, hereby
     certify to the following:
15       That the witness, SCOTT HELFAND, was duly sworn by
     the officer and that the transcript of the oral
16   deposition is a true record of the testimony given by
     the witness;
17       That the original deposition was delivered to
     Mr. Michael Joseph Bitgood.
18       That a copy of this certificate was served on all
     parties and/or the witness shown herein on
19               .
         I further certify that pursuant to FRCP No.
20   30(e)(2) that the signature of the deponent:
         __X__ was requested by the deponent or a party before
21   the completion of the deposition and that the signature
     is to be returned within 30 days from date of receipt of
22   the transcript.  If returned, the attached Correction
     Page contains any changes and the reasons therefor;
23       _____ was not requested by the deponent or a party
     before the completion of the deposition.
24       I further certify that I am neither counsel for,
     related to, nor employed by any of the parties in the
25   action in which this proceeding was taken, and further
```

Page 136

1    that I am not financially or otherwise interested in the
     outcome of the action.

2

     Certified to by me this_____day of_____ 20__.

3

4

5    _____

     Monica Victor, CSR No. 3076

6    Expiration: January 17, 2023

     FIRM REGISTRATION NO. 223

7    WORLDWIDE COURT REPORTERS, INC.

     3000 Weslayan, Suite 235

8    Houston, Texas 77027

     12621 Featherwood Dr.

9    Suite 290

     Phone: 713.572.2000

10   Facsimile: 713.572.2009

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25